TRUSTEES OF the PRESSMEN LOCAL 72 INDUSTRY PENSION FUND, et al.

v.

JUDD & DETWEILER, INC.

JUDD & DETWEILER, INC.

v.

John J. HARKINS, et al.

Civ. Nos. JFM–88–562, JFM–88–908.

United States District Court, D. Maryland.

Dec. 21, 1988.

Kenneth Johnson, O'Donoghue & O'Donoghue, Washington, D.C., for plaintiff.

Andrew McCorkle, Sanders, Schnabel & Bradenburg, P.C., Washington, D.C., for defendant.

MEMORANDUM

MOTZ, District Judge.

On December 3, 1985, Judd & Detweiler, Inc. ("J & D") announced its decision to close down its unionized printing operation in Washington, D.C. Until that time, J & D had been the largest contributing member of the Pressmen Local 72 Industry Pension Fund ("Fund"), a multi-employer plan established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") as amended by the Multi-employer Pension Plan Amendments Act of 1980 ("MPPAA").

Three days after J & D's announcement of its intention to close the printing operation, the trustees of the Fund passed a resolution increasing the benefits to plan participants. The effect of this resolution was to increase J & D's withdrawal liability from zero to an amount eventually assessed at $132,775. J & D began payment of the sum owing in accordance with ERISA rules and then requested that the Trustees reconsider this assessment. This request was denied, and J & D proceeded to arbitration, the next step in the appeals process. The Arbitrator, Donald S. Grubbs, Jr., found that a preponderance of the evidence demonstrated that the actuarial assumptions used by the trustees were, in the aggregate, unreasonable, taking into account the experience of the plan and reasonable expectations. Specifically, the Arbitrator found that the trustees' assumption of an interest rate of 6% was unreasonable and that the trustees should have used an interest rate assumption of 6.5% or more. It is undisputed that if such an assumption had been used, J & D would have no withdrawal liability.

J & D and the Fund have filed cross-actions seeking, respectively, to enforce and to vacate the arbitration award.

I.

■ As a threshold matter, the Fund argues that the award should be set aside because the Arbitrator lacked the impartiality required under the Arbitration Act. Specifically, the Fund contends that the Arbitrator had an "evident partiality," *see* 9 U.S.C. Section 10(b), because he had previously testified as an expert witness in six arbitration proceedings on issues upon which he was called upon to rule in this case.[1]

The Fund's argument is without merit. The ability to decide the complex issues raised in MPPAA arbitration proceedings requires an arbitrator to possess expertise, and it is not unreasonable to expect that persons who are qualified to serve as arbitrators may have formed and expressed views on matters within the area of their expertise prior to their arbitration service. Entirely reasonable safeguards exist to prevent any resultant unfairness. The rules of the American Arbitration Association provide a party with an opportunity to investigate the background of a proposed arbitrator and to strike his name before he is selected. After the selection the chosen arbitrator must disclose any possible conflicts, and if a disqualification motion is filed, it is ruled upon by the AAA. Moreover, if a party learns of any views expressed by the arbitrator which it alleges predisposes him to one side or the other, that party if free to bring them to the attention of the reviewing court which can consider them fully, just as any other mat-

---

1. Unlike *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), the case upon which the Fund primarily relies, this case involves no undisclosed conflicts of interest or imputation of improper conduct on the part of the arbitrator. Indeed, although this Court finds that Arbitrator Grubbs erred, the fact that he ruled on several issues adversely to J & D demonstrates that he adhered to his obligation of impartiality. Likewise, no procedural irregularity occurred. In accordance with the usual procedure of the American Arbitration Association in such cases, the names of potential arbitrators were sent to the parties who were free to strike anyone whom they found unacceptable. The Fund did not strike Mr. Grubbs, and after the lists were returned, the AAA for the first time notified Mr. Grubbs of the potential arbitration. Mr. Grubbs immediately disclosed the prior cases in which he had appeared as an expert. The Fund then moved to disqualify him but the AAA denied the motion. Thereafter, in accordance with the AAA's decision, Mr. Grubbs himself denied a motion to recuse filed by the Fund during the course of the proceedings.

**1354**

ter of record, in reviewing the arbitrator's decision.

## II.

■ The second question which is presented concerns the use of funding assumptions for the purpose of determining withdrawal liability.[2] That question turns upon an analysis of 29 U.S.C. Section 1393, which provides in pertinent part as follows:

(a) Use by plan actuary in determining unfunded vested benefits of plan for computing withdrawal liability of employer

The ... [Pension Benefits Guaranty Corporation] may prescribe by regulation actuarial assumptions which may be used by a plan actuary in determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part. Withdrawal liability under this part shall be determined by each plan on the basis of—

(1) *actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations)* and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or

(2) actuarial assumptions and methods set forth in the corporation's regulations for purposes of determining an employer's withdrawal liability.

(b) Factors determinative of unfunded vested benefits of plan for computing withdrawal liability of employer

In determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part, *the plan actuary may—*

(1) *rely on the most recent complete actuarial valuation used for purposes of section 412 of Title 26* and reasonable estimates for the interim years of the unfunded vested benefits, and

(2) ....

29 U.S.C. § 1393. (Emphasis added).

The Fund argues that Section 1393(b)(1) authorizes a plan to base its determination of an employer's withdrawal liability entirely upon the assumptions used in its most recent actuarial study conducted for funding purposes. J & D, on the other hand, contends that Section 1393(a)(1) requires that the actuarial assumptions which are used be reasonable for the purpose of determining withdrawal liability and that Section 1393(b)(1) merely permits the plan actuary to consider the assumptions and data contained in the plan's most recent actuarial study as part of this reasonableness determination.

J & D's position is supported by the plain language of the statute. Section 1393(a)(1) unquestionably establishes a reasonableness standard, and Section 1393(b)(1) states only that the plan may, in making its withdrawal liability determination, "rely on the most recent complete actuarial valuation used for purposes of Section 412 of Title 26 [i.e., for funding purposes]." Section 1393(b)(1) does not state that the withdrawal liability determination may be based entirely upon the most recent actuarial funding assumptions, and in context all it appears to do is to relieve a prudent plan actuary of what he would otherwise perceive to be his fiduciary duty to the plan and its beneficiaries of conducting a new actuarial study every time that an employer withdraws from the plan.

The Fund argues, however, that remarks made by Frank Thompson, Jr., one of the floor managers in the House of Representatives for the MPPAA, supports its interpretation of Section 1393. Representative Thompson stated as follows:

The bill provides that a plan may use its own actuarial assumptions to value unfunded vested benefits for withdrawal liability purposes, or assumptions prescribed in PBGC regulations....

A plan that does not use PBGC assumptions must use assumptions that are rea-

---

**2.** The parties have not cited any cases in which a court has ruled upon this question. In *Board of Trustees, Michigan United Food and Commer-* *cial Workers Unions v. Eberhard Foods, Inc.,* 831 F.2d 1258 (6th Cir.1987), the Sixth Circuit reserved judgment on it.

sonable in the aggregate. Under the bill's plan reorganization provisions, many plans will be computing the value of their unfunded vested benefits, subject to Treasury Department standards and oversight. Rather than performing a separate calculation, plans will be able to use those same figures for withdrawal liability purposes if the computation was satisfactory for purpose of the reorganization provisions. *Similarly, it is intended that a plan be permitted to base its withdrawal liability determination on the value of vested benefits reported on the Schedule B attached to the plan's annual report, provided the Schedule B figure was computed appropriately....*

(126 Cong.Rec., 23,041 (1980) (emphasis added)).

This language does provide a firmer foundation for the Fund's argument. To say that a plan is "permitted to base its withdrawal liability determination" on the valuation in a funding report is to say more than that a plan may "rely on" its most recent actuarial study in making a reasonable determination of withdrawal liability. Congress, however, enacted Section 1393, not the remarks of Representative Thompson. Furthermore, there is even some ambiguity in Representative Thompson's remarks themselves. The final clause of the quoted paragraph contains a proviso that "the Schedule B figures ... [must have been] computed appropriately." Although it may well be that he was using the word "appropriately" only to mean "appropriately for Schedule B purposes," he might have meant "appropriately for withdrawal liability purposes." This latter interpretation draws some support from the fact that in the immediately preceding paragraph of his remarks Representative Thompson had recognized, in discussing the regulations which the Pension Benefit Guaranty Corporation is authorized to promulgate under Section 1393, that different sets of assumptions may be appropriate for the different

purposes of funding and withdrawal liability.[3]

There is a further indication that the Senate, at least, did not intend that reasonable funding assumptions should be automatically deemed to be reasonable for withdrawal liability purposes. When the Senate was first considering the MPPAA legislation, it substituted the text of S. 1076 for the text of H.R. 3904, which had previously been passed by the House. S. 1076 contained a provision (Section 4221(a)(3)) which would have enabled a plan to meet its burden of proof in an arbitration proceeding by showing that it had used "the same actuarial assumptions" in making its withdrawal liability determination that it had used for funding purposes. 126 Cong.Rec. 20,157 (1980). Subsequently, the Senate adopted an amendment to that provision which deleted the reference to "the same actuarial assumptions" and substituted in its stead language indicating that a plan should show in an arbitration proceeding that it had used assumptions "which are reasonable in the aggregate and, to the extent not inappropriate, not inconsistent with the actuarial assumptions used by the plan" for funding purposes. 126 Cong.Rec. 20,818 (1980). Ultimately, this substitution became academic because H.R. 3904 rather than S. 1076 was the version of the MPPAA which was enacted. However, it would appear to be extremely doubtful that when finally passing H.R. 3904 the Senate read the language of Section 1393(b)(1) as having the same meaning as the "same actuarial assumptions" clause which it had expressly rejected.

III.

■ The Fund also attacks the Arbitrator's decision on the ground that he did not give a presumption of correctness to the Fund's withdrawal liability determination. Such a presumption is required under 29 U.S.C. Section 1401(a)(3)(A) "unless the party contesting the determination shows by a preponderance of the evidence that

---

**3.** The Pension Benefit Guaranty Corporation has never issued the regulations which it is authorized to promulgate.

the determination was unreasonable or clearly erroneous."

■ This contention is well founded. While the Arbitrator did formally acknowledge the existence of the prescribed presumption in his decision, he never substantively addressed the reasons advanced by the trustees for their determination of withdrawal liability and only stated the reasons he believed that an assumption of an interest rate of less than 6.5% was unreasonable. In short, he merely substituted his own judgment for that of the trustees.

■ Since the Arbitrator did not give the necessary presumption of correctness to the Fund's determination, this Court cannot presume, as it would otherwise be required to do, *see* 29 U.S.C. Section 1401(c), that the Arbitrator's finding of unreasonableness was correct. Under other circumstances the Court would be inclined to remand the case to the Arbitrator to reconsider the issues, giving substantive regard to the presumption of correctness, and to make further findings in the event that he continued to believe the Fund's liability determination was incorrect. Here, however, a remand would be in vain because it can be said on the record as it now exists that if the Arbitrator were to reaffirm his view, the presumption of the correctness of that view would be rebutted by a clear preponderance of the evidence. *See* 29 U.S.C. Section 1401(c).

The Arbitrator's decision concerning the reasonableness of the interest rate assumption constituted no more than the application in slightly modified form of a view which he had previously expressed as an expert witness that U.S. Treasury and corporate bond rates establish the measure by which the reasonableness of a plan's interest assumption is to be measured.[4] Stripped to its essentials, the Arbitrator's

reasoning was this: (1) the trustees had chosen to invest a substantial portion of the plan's assets in equities; (2) presumably, the reason they had done so was to earn a higher rate of return than they could from Treasury and corporate bonds; (3) on the date of J & D's withdrawal from the Fund, the rates of return on Treasury bonds ranged (depending upon maturity date) from 8.06% to 8.56% and the rates on corporate bonds ranged (depending upon quality) from 9.29% to 10.82%; and (4) therefore, the trustees necessarily must have expected to obtain a higher rate of return than 8 to 10%.[5] This logic has the appeal of simplicity. However, the evidence unquestionably establishes three reasons why the Trustees (whose determination is presumptively correct) saw and were entitled to see things quite differently.

First, as a matter of investment policy the allocation of a major portion of the Fund's portfolio to government and corporate bonds may be deemed to be unwise. If interest rates were to rise, the market value of the bonds would decline, and the Fund would be unable (without realizing a capital loss) to adjust the mix of its holdings. In that event it would be locked in to investments at below market interest rates and would be deprived of the opportunity to participate in more attractive investment opportunities. Indeed, unless a plan's particular circumstances so warrant, overcommitment of the plan's portfolio to bonds (or any other single type of investment) might well constitute a breach of the trustees' fiduciary duty to maintain a diversified portfolio. *See* 29 U.S.C. Section 1414(a). Thus, the trustees of the Fund clearly could reasonably decide—without believing that the Fund necessarily would obtain higher yields from other investments that they should not limit the Fund's investments to the bonds which, at the time of J

---

4. The only two contexts in which the Arbitrator apparently does not believe that this test is appropriate are where (a) a plan's liquidity needs require investment in short-term paper, or (b) a substantial portion of the plan's assets are locked into a group annuity contract at a rate of return less than that available on the bond market. Record, tab 2, at 265–66.

5. The Arbitrator noted that over the preceding five years the plans average rate of return had been 14% a year. However, he properly recognized that this rate of return was an unrealistic basis for predicting future return, and he recited it only as evidence of the trustees' investment motivation.

& D's withdrawal, would have assured the 8%–10% rate of return.[6]

Second, the record is uncontradicted that the unionized printing industry in the Washington, D.C. area has experienced substantial difficulties within recent years. Three of the largest employers have ceased their operations in the last decade or so. One of the Trustees, John J. Harkins, testified that "the union industry in Washington, D.C. is in a decline. It is only a question of how deep the decline is, and when the decline is going to get what company." (Record, tab 1, at 162). J & D's secretary-treasurer acknowledged that union companies in the area have had a difficult time competing with the non-union sector. (Record, tab 1, at 34–35). As a result, there has been (and may continue to be) a decline in the base of workers who will be contributing to the Fund, with consequent adverse effects upon the Fund's stability. Moreover, because of the unfavorable competitive environment, the 1986 collective bargaining agreement froze the rate of contribution to the Fund for the period 1986 to 1989. The Fund's actuary testified that this was one of the specific reasons that the interest rate assumption was not raised for the 1986 actuarial evaluation.

Third, under the MPPAA the reasonableness of an interest assumption must not be judged in isolation; rather the actuarial assumptions and methods must be reasonable "in the aggregate." 29 U.S.C. Section 1393(a)(1). The Fund's uncontradicted evidence demonstrated that the mortality age assumption used by the Fund was somewhat low and that its retirement age assumption was somewhat high. The Arbitrator discounted this testimony entirely simply by stating his view that "in most cases" the effect of mortality and retirement age assumptions is "probably minor" in comparison with the interest rate assumption. Absent specific evidence in the record substantiating that position, the Arbitrator's approach seems to be tantamount to a rejection of the statutory mandate that the actuarial assumptions be considered in

the aggregate. In any event, assuming the Arbitrator's observation is generally true, the Fund's actuary pointed to a factor present in this case which is not present "in most cases": the Fund's concern that J & D's cessation of operations would itself cause a number of early retirements, thereby placing an unanticipated drain on the Fund. Neither J & D nor the Arbitrator addressed that issue in any respect.

## IV.

J & D raises three other issues on which the Arbitrator ruled against it.

■ First, it contends that the Arbitrator erred in permitting the Trustees to use actuarial value rather than market value in determining the amount of the Fund's unfunded vested benefits. The record fully establishes that there is a difference of opinion among actuaries as to which of these approaches is preferable and that the actuarial value here was sufficiently close to the market value to make the Trustee's utilization of the former reasonable.

■ Second, J & D argues that the "general purpose" of the MPPAA of protecting remaining employers from increased liability would not be served by imposing withdrawal liability upon it here because the decision to increase the benefits under the plan was made after J & D had notified the Fund of its intent to withdraw. There is no provision in the statute which supports that argument, and Section 1383(a)(1)—providing that withdrawal liability is to be measured as of the date that an employer "permanently ceases to have an obligation to contribute under the plan"—squarely contradicts it.

■ Third, citing Justice O'Connor's concurring opinion in *Connolly v. Pension Benefit Guaranty Corporation*, 475 U.S. 211, 235–36, 106 S.Ct. 1018, 1031–32, 89 L.Ed.2d 166 (1986), J & D suggests that the imposition of liability upon it for increased benefits declared after its announced with-

---

**6.** It should be noted that the record establishes that the 6% rate used by the Fund includes investment expenses and is therefore the func-

tional equivalent of an interest rate of approximately 6.25%.

drawal violates due process. However, in light of the uncontradicted evidence that the Fund had been considering such an increase prior to J & D's announced withdrawal (Record, tab 1, at 38–40; tab 10, at 854–73) it cannot be said that the Trustees' decision was "arbitrary and irrational" and made in bad faith.

A separate order is being entered herewith denying J & D's motion to enforce the arbitration award and granting the Fund's motion to vacate it.