CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al., Plaintiffs,

v.

BELL TRANSIT COMPANY, etc., Defendants.

No. 92 C 6508.

United States District Court, N.D. Illinois, E.D.

May 7, 1993.

Margaret M. Fahrenbach and Terence G. Craig, Cent. States Law Dept., Rosemont, IL, for plaintiffs.

Leonard R. Kofkin, Donald J. Vogel, Fagel & Haber, Chicago, IL, and Mark T. Vuono, Vuono, Lavelle & Gray, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund (the "Fund") and one of its trustees brought this action against defendant Bell Transit Company ("Bell"), which formerly had employees who are participants in the Fund. Count I is a claim for withdrawal liability under the Employee Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1001 *et seq.* In Count II, plaintiffs seek to vacate an arbitration award finding that defendant had not incurred withdrawal liability. In a counterclaim against the Fund, Bell seeks a refund of interim payments of withdrawal liability made while the arbitration proceeding was pending. Presently pending are cross-motions for summary judgment. Plaintiffs move for summary judgment on Count II. Defendant moves for summary judgment dismissing plaintiffs' entire complaint and awarding relief on defendant's counterclaim.[1]

The material facts of this case are not in dispute. Prior to May 1, 1987, Bell had been a party to certain collective bargaining agreements with the International Brotherhood of Teamsters. Those agreements required that Bell make pension contributions to the Fund on behalf of certain employees. On May 3, 1987, Bell sold its covered operations and ceased to have any obligation for further contributions. Bell sold substantially all its assets to Best Transport, Inc. ("Best") which agreed to be bound to make pension contributions for former Bell employees. By July 31, 1987 at the latest, Bell had converted all of its assets to cash. Although it filed papers indicating that it intended to distribute the cash to its shareholders, it has not done so. Bell continues to hold the cash.

The cessation of Bell's operations ordinarily would constitute a complete withdrawal from the Fund. Bell, however, will not be subject to withdrawal liability if the requirements set forth in 29 U.S.C. § 1384 are satisfied. That statute provides:

(1) A complete or partial withdrawal of an employer (hereinafter in this section referred to as the "seller") under this section does not occur solely because, as a

---

1. Defendant's motion to strike plaintiffs' reply brief is denied.

result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if—

(A) the purchaser has an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan;

(B) the purchaser provides to the plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond issued by a corporate surety company that is an acceptable surety for purposes of section 1112 of this title, or an amount held in escrow by a bank or similar financial institution satisfactory to the plan, in an amount equal to the greater of—

(i) the average annual contribution required to be made by the seller with respect to the operations under the plan for the 3 plan years preceding the plan year in which the sale of the employer's assets occurs, or

(ii) the annual contribution that the seller was required to make with respect to the operations under the plan for the last plan year before the plan year in which the sale of the assets occurs, which bond or escrow shall be paid to the plan if the purchaser withdraws from the plan, or fails to make a contribution to the plan when due, at any time during the first 5 plan years beginning after the sale; and

(C) the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 plan years, the seller is secondarily liable for any withdrawal liability it would have had to the plan with respect to the operations (but for this section) if the liability of

the purchaser with respect to the plan is not paid.

(2) If the purchaser—

(A) withdraws before the last day of the fifth plan year beginning after the sale, and

(B) fails to make any withdrawal liability payment when due, then the seller shall pay to the plan an amount equal to the payment that would have been due from the seller but for this section.

(3)(A) If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described in paragraph (1)(C), then the seller shall provide a bond or amount in escrow equal to the present value of the withdrawal liability the seller would have had but for this subsection.

(B) If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with regulations prescribed by the corporation, in a manner consistent with subparagraph (A).

(4) The liability of the party furnishing a bond or escrow under this subsection shall be reduced, upon payment of the bond or escrow to the plan, by the amount thereof.

29 U.S.C. § 1384.

The Fund does not contend that the requirements of subsections (A), (B), and (C) of subsection (1) have not been satisfied.[2] The dispute is whether Bell's action of converting its assets to cash means it has been "liquidated" as that term is used in subsection (3)(A). If Bell's conduct constitutes being liquidated, then the parties also dispute whether failure to provide a bond or escrow in accordance with subsection 3(A) subjects Bell to withdrawal liability.

In 1990, the Fund determined that Bell was subject to withdrawal liability because it had liquidated without providing a bond or escrow as required by subsection 3(A). Bell

---

2. For purposes of this litigation, the parties have agreed to assume that these requirements are satisfied. Apparently, Best has never posted a bond. The parties stipulated and documents indicate that, in December 1987, Best requested a variance from posting a bond. Variances may be granted under certain circumstances. *See* 29 U.S.C. § 1384(c); 29 C.F.R. § 2643.11(a). In the request for a variance, Best stated that it

would not obtain a bond pending the Fund's ruling on the requested exemption. The parties have stipulated that the Fund has neither granted nor denied Best's request for a variance. Under the applicable regulations, Best cannot be required to provide the bond until 30 days after any denial of a request for a variance from the bond requirement. *See* 29 C.F.R. § 2643.11(d).

timely requested arbitration and then made interim payments of withdrawal liability pending resolution of the arbitration. In an award dated January 15, 1993, the arbitrator held that the conversion of assets to cash does not constitute being liquidated under subsection 3(A). He held that Bell would not be "liquidated" until the cash is distributed to shareholders. The arbitrator also held that, even if Bell had been liquidated, subsection 3(A) would only require that a bond be posted or an escrow established; it would not result in withdrawal liability for Bell.

First, the proper standard of review must be determined. The Fund contends that the presumption of 29 U.S.C. § 1401(a)(3)(A) applies. "For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 1381 through 1399 of this title and section 1405 of this title is presumed correct unless a party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." *Id.* Bell contends that the arbitrator's determination that Bell was not liquidated is a mixed question of law and fact to which this court must defer unless clearly erroneous. *See Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Louis Zahn Drug Co.,* 890 F.2d 1405, 1411 (7th Cir.1989).

■■ Under 29 U.S.C. § 1401(c), findings of fact of the arbitrator are presumed true unless rebutted by a clear preponderance of the evidence. Legal determinations, however, are fully reviewable by the courts. *Zahn Drug,* 890 F.2d at 1409 (citing *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.,* 872 F.2d 208, 212 (7th Cir.), *cert. denied,* 493 U.S. 847, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989)). In *Zahn Drug,* the Seventh Circuit held that the clearly erroneous standard applied to mixed questions of law and fact involving "fact-specific, non-recurring determinations," but that "the parties have a right to expect that the re-

viewing court will scrutinize fully the arbitrator's understanding of the underlying legal principles." 890 F.2d at 1411. The question of whether being liquidated under the statute requires that cash be actually distributed is a legal question not limited by the fact review standard for arbitration proceedings. It is a question of statutory construction for which there is *de novo* review in the courts. *Cf. Central States, Southeast & Southwest Areas Health & Welfare Fund v. Cullum Cos.,* 973 F.2d 1333, 1337 (7th Cir.1992) (arbitrator's interpretation of 29 U.S.C. § 1384(a)(1)(A) is reviewable *de novo* ). Whether a liquidation without providing a bond subjects a seller to withdrawal liability is also a legal question of statutory construction that is subject to *de novo* review.[3] *Cf. id.*

■ Although the arbitrator's legal determinations are not subject to deferential review, it still must be considered whether the Fund's determinations, factual and legal, are subject to deferential review pursuant to § 1401(a)(3)(A). The presumption of § 1401(a)(3)(A) applies to both the arbitrator and court review. *Grand Union Co. v. Food Employers Labor Relations Association,* 808 F.2d 66, 70 (D.C.Cir.1987). No case has been cited or found which discusses whether the presumption under § 1401(a)(3)(A) applies to legal determinations. The statute refers to deference to "determinations" without limiting such deference to factual determinations. *Cf. United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 135 n. 9 (3d Cir.1986), *aff'd by equally divided court,* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (per curiam) (statute provides for deference to "trustees' factual determinations and discretionary judgments"). A standard of review, however, that refers to unreasonableness or clear error being shown by "a preponderance of the evidence" implies deference is primarily to factual questions or mixed questions of fact and law; pure legal questions would not

**3.** Alternatively, to the extent the issue of being liquidated is a mixed question of law and fact, the Fund's determination would be subject to deferential review pursuant to 29 U.S.C. § 1401(a)(3)(A). Since the arbitrator failed to accord to the Fund's determination the § 1401(a)(3)(A) presumption of correctness, the

arbitrator's determination would not be accorded the presumption contained in § 1401(c) even if that presumption were otherwise applicable. *Trustees of Pressman Local 72 Industry Pension Fund v. Judd & Detweiler, Inc.,* 736 F.Supp. 1351, 1356 (D.Md.1988); *Combs v. Classic Coal Corp.,* 931 F.2d 96, 102 (D.C.Cir.1991).

be decided by a preponderance of the evidence. Also, a clearly erroneous standard implies review of facts. *Compare* Fed. R.Civ.P. 52(a) (findings of fact of district court are not to be set aside unless clearly erroneous). A standard of unreasonableness, however, implies that discretionary determinations, factual or otherwise, are also subject to deferential review. *See, e.g., Soler v. Waite*, 989 F.2d 251, 253 (7th Cir.1993); *United States v. Ashman*, 979 F.2d 469, 495 (7th Cir.1992).

■ Legal rulings are not discretionary determinations; the Fund does not have the discretion to ignore the statute. *Cf. Cullum*, 973 F.2d at 1339. Purely legal determinations of the Fund are not owed deference under § 1401(a)(3)(A). Deference need only be given to factual determinations, mixed questions of law and fact, and discretionary determinations. The issues presently in dispute are legal questions of statutory construction.[4]

The first question to be addressed is the meaning of the term "liquidated" as used in § 1384. "If all, or substantially all, of the seller's assets are distributed, or if a seller is *liquidated* before the end of the 5 plan year period described in paragraph (1)(C), then the seller shall provide a bond or amount in escrow equal to the present value of the withdrawal liability the seller would have had but for this subsection." 29 U.S.C. § 1384(a)(3)(A). The arbitrator focused on the past tense of "liquidated" and concluded that the duty to provide a bond or escrow arose simultaneously with the actual distribution of the cash. Bell makes the arguments that were successful before the arbitrator. The Fund primarily argues that "liquidated" must have a meaning distinct from "distrib-

uted" and also that, under corporation law, conversion of other assets to cash constitutes being liquidated. No cases have been found which construe the meaning of "liquidated" as used in § 1384.

The initial focus of statutory construction is the plain language of the statute. Therefore, the first question is whether "liquidated" has an unambiguous meaning. Does it only mean the distribution of cash assets? Does it only mean the process of converting other assets to cash? Or, can it have either meaning in which case the statute may be ambiguous and more than just the plain language may have to be examined?

Considering the word "liquidated" in isolation, i.e. without considering its context within a sentence or paragraph, its meaning is ambiguous. "Liquidated" can mean (1) that noncash assets have been converted to cash, *see, e.g., Black's Law Dictionary* 930 (6th ed. 1990) (citing *Farmer's State Bank & Trust Co. v. Brady*, 137 Tex. 39, 152 S.W.2d 729, 732 (1941); *Fleckner v. Bank of United States*, 21 U.S. (8 Wheat.) 338, 362, 5 L.Ed. 631 (1823)) ("*Black's*") (liquidate) ("To convert assets to cash."); *Webster's Third New International Dictionary* 1319 defn. 4 (1981) ("*Webster's*") (liquidate) ("to convert (assets) into cash <liquidated his securities>"); (2) that assets and debts have been finally determined, *see, e.g., Black's* at 930 (citing *Electrical Products Corp. of Oregon v. Ziegler Drug Stores, Inc.*, 157 Or. 267, 71 P.2d 583, 584 (1937)) (liquidated) ("made certain as to what and how much is due"); *id.* (citing *State ex rel. Banister v. Cantley*, 330 Mo. 943, 52 S.W.2d 397, 399 (1932)) (liquidate) ("to ascertain the balance and to whom payable"); *Webster's* at 1319 defn. 1a (liquidate) ("to determine by agreement or by litigation the

---

4. Bell also contends that the presumption of § 1401(a)(3)(A) is unconstitutional. The courts of appeal are split on this issue with only one finding the statute to be unconstitutional and at least five others upholding the statute as constitutional. *See Sherwin–Williams Co. v. Central States, Southeast & Southwest Areas Pension Fund*, 787 F.Supp. 136, 138 (N.D.Ill.1992) (collecting cases). The Supreme Court has recently granted *certiorari* on the issue and apparently will resolve the conflict. *See Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, — U.S. —, 112 S.Ct. 2273, 119 L.Ed.2d 200 (1992) (granting *certiorari* ). Since the presumption is otherwise found to be inapplicable in the

present case, it is unnecessary to resolve the constitutional question. It is noted, however, that 28 U.S.C. § 2403(a) and Fed.R.Civ.P. 24(c) require that the parties or the court notify the Attorney General of the United States of the pendency of any action challenging the constitutionality of a federal statute. *See Tonya K. v. Board of Education of City of Chicago*, 847 F.2d 1243, 1247 (7th Cir.1988). Therefore, a copy of today's order is being sent to the United States Attorney for the Northern District of Illinois. Defendant is also directed to send a copy of today's order to the United States Attorney along with a copy of all briefs in which the constitutional issue is addressed.

precise amount of (indebtedness, damages, accounts)"); *id.* defn. *vi* 2 (liquidate) ("to determine (as of a firm that is going out of business) liabilities and to apportion assets toward discharging indebtedness"); *Wasmann v. City National Bank of Knoxville, Tennessee,* 52 F.2d 705, 707 (6th Cir.1931) ("that it had bought and liquidated the savings bank ... meant that it had undertaken to wind up the affairs and pay off the obligations of the purchased bank"); *In re Burger's Estate,* 276 Mich. 485, 267 N.W. 887, 891 (1936) ("While liquidation of a corporation is usually a step in its dissolution, the latter is not a necessary element of the former.... Liquidation means realization on assets and discharge of liabilities."); or (3) that all assets have been reduced to cash and the cash has actually been distributed, *see, e.g., Black's* at 930 (citing *Murchison v. Levy Plumbing Co.,* 73 S.W.2d 967, 968 (Tex.Civ. App.1934)) (liquidated) ("cleared away; paid; discharged"); *id.* (citing *Trenton Banking Co. v. Kennedy,* 17 N.J.Misc. 222, 8 A.2d 232, 234 (N.J.Cir.1939)) (liquidated) ("settled, paid, discharged."); *id.* (citing *Fleckner,* 21 U.S. (8 Wheat.) at 362)) (liquidate) ("to gather in the assets, convert them into cash and distribute them according to the legal rights of the parties interested; to lessen"); *Maffia v. American Woolen Co.,* 125 F.Supp. 465, 467 (S.D.N.Y.1954) ("Ordinarily, a liquidation of a company contemplates not merely that the assets will be converted into cash, but also that the cash will be used to reduce indebtedness and outstanding stock.... The conversion of assets of a company into cash may be a liquidation of those assets, but it is not necessarily a liquidation of the company, for the company still possesses the assets, either in their original form or in the cash which it received for them on the sale.")[5]

The meaning of "liquidated" still must be determined within the context of how it is used in the statute. The statute refers to two situations under which subsection 3(A) will come into play. It applies if "the seller's assets are distributed, *or* if the seller is liquidated." 29 U.S.C. § 1384(a)(3)(A) (em-

phasis added). "It is a basic rule of statutory construction that, if possible, effect is to be given to each and every word, clause and sentence in a statute, and a construction that results in any portion of a statute being superfluous should be avoided." *Thurner Heat Treating Corp. v. National Labor Relations Board,* 839 F.2d 1256, 1259 (7th Cir. 1988). *See also Zimmerman v. North American Signal Co.,* 704 F.2d 347, 353 (7th Cir. 1983) ("As a general rule, a court should not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous.") The statute otherwise provides that subsection 3(A) comes into play when the seller's assets are distributed. This would include the situation where cash assets are distributed. Therefore, construing "liquidated" to mean the time at which cash is distributed would be redundant and superfluous; that situation is already covered by the phrase "all, or substantially all, of the seller's assets are distributed." Therefore, a construction of "liquidated" that is distinguishable from the distribution of assets would be favored so that inclusion of the phrase "or if the seller is liquidated" is not rendered redundant and superfluous. "[T]he seller is liquidated" will be construed as meaning all or substantially all of the seller's assets have been converted to cash for the purpose of winding up the affairs of the seller.

■ Bell completed the process of converting its assets to cash by no later than July 31, 1987. This conversion was for the purpose of winding up the affairs of the corporation and in preparation for the distribution of the cash to Bell's shareholders. As of July 31, 1987, Bell had been liquidated as that term is used in § 1384(a)(3)(A). The arbitrator's holding to the contrary cannot be upheld because it is inconsistent with the applicable law. That holding, however, is only an alternative holding. The arbitrator's award denying withdrawal liability can still be upheld if he was correct in determining that failure to post a bond or escrow when the seller is liquidated does not cause the seller to be subjected to withdrawal liability.

---

5. Both parties rely on 16A *Fletcher Cyclopedia of the Law of Private Corporations* § 7968 (rev. perm. ed. 1988) which defines liquidation as meaning "the winding up of the affairs of a corporation by getting in its assets, settling with creditors and debtors and apportioning the amount of profit and loss." *Fletcher* does not make clear whether the definition of "liquidated" necessarily includes actual distribution of all cash.

■ Under § 1384(a)(1), a sale such as occurred here does not constitute a complete or partial withdrawal if the requirements of subsections 1(A), 1(B), and 1(C) are satisfied. *See Cullum,* 973 F.2d at 1335. Subsection 1(A) requires that the purchaser assume the obligation of contributing to the pension plan. Subsection 1(B) requires that the purchaser provide a bond or escrow to the pension plan to cover any withdrawal liability or unpaid contributions of the purchaser during the first five plan years after the sale.[6] Subsection 1(C) requires that the sales contract provide that the seller remains secondarily liable for withdrawal liability in the event the purchaser withdraws during the first five plan years after the sale and fails to pay its liability. Whether the three requirements of § 1384(a)(1) are satisfied generally is determined as of the time of the sale. *Cullum,* 973 F.2d at 1338.[7] The statute specifically exempts sales of assets to unrelated entities from being withdrawals if the three requirements of § 1384(a)(1) are met; the statute is self-executing without any requirement that the exemption be approved by the Fund. *Cf. Artistic Carton Co. v. Paper Industry Union–Management Pension Fund,* 971 F.2d 1346, 1352 (7th Cir.1992). Since there is no dispute that § 1384(a)(1) is satisfied, Bell's cessation of operations upon the sale to Best was not a withdrawal by Bell.

Under § 1384(a)(1), the Fund is protected in two ways in the event that the purchaser fails to pay its new obligations. First, the purchaser must provide a bond or escrow to cover contributions due after the sale and also to cover withdrawal liability in the event the purchaser subsequently withdraws from the pension plan. 29 U.S.C. § 1384(a)(1)(B). Second, the seller must, by contract, be secondarily liable for withdrawal liability if the purchaser fails to pay its liability to the pension plan. *Id.* § 1384(a)(1)(C). *See also Cullum,* 973 F.2d at 1340 & n. 2–3.

As further protection, the statute expressly provides that, should the purchaser withdraw within five plan years and fail to timely pay its withdrawal liability, the seller shall be liable for the withdrawal liability that would otherwise have been due had the sale been considered a withdrawal. 29 U.S.C. § 1384(a)(2).

Finally, § 1384(a)(3) provides further protection against being unable to collect from the seller should the seller subsequently incur any liability. *See Cullum,* 973 F.2d at 1340 ("another safeguard"). This section requires that the seller provide a bond or escrow should, during the first five plan years after the sale, some or all of the seller's assets be distributed or all or substantially all the seller's assets be liquidated. The amount of the bond or escrow is measured by the withdrawal liability that the seller would have had. Although not expressly stated, consistent with the other provisions of the statute, the bond or escrow would be to cover any secondary liability in accordance with § 1384(a)(1)(C) or under § 1384(a)(2). *Cf. New York State Teamsters Conference Pension & Retirement Fund v. St. Lawrence Transit Mix Corp.,* 612 F.Supp. 1003, 1009 (N.D.N.Y.1985) ("Subsection (3) is designed to further protect the plan sponsor. This subsection provides that a seller who liquidates substantially all of its assets within the five year period must provide a bond to protect the seller's secondary liability"). The seller cannot incur any withdrawal liability pursuant to § 1384(a)(1)(C) or § 1384(a)(2) unless the purchaser withdraws within five plan years and the purchaser fails to pay its withdrawal liability. Therefore, absent any withdrawal liability being incurred by the purchaser within the five-year period, the bond would only have to remain in force until the end of the five-year period or, alternatively, any amounts set aside in escrow would be returned to the seller at the end of the five-year period.[8]

---

**6.** Since the amount of the bond or escrow is measured by annual contributions, not potential withdrawal liability, the bond or escrow may be insufficient to cover any withdrawal liability incurred by the purchaser.

**7.** *Cullum* only concerned § 1384(a)(1)(A), but cited a case indicating satisfaction of subsections 1(B) and 1(C) are also determined as of the time of the sale. The latter references are *dictum* in *Cullum.* Given that variances from subsections

1(B) and 1(C) may be applied for and that subsection 1(B) need not be immediately satisfied if application for a variance is made within a year of the sale, *see* 29 C.F.R. § 2643.11, there are at least some circumstances where, as to at least subsection 1(B), the existence of the exemption must take into account actions that occur after the time of the sale.

**8.** If withdrawal liability is incurred by the purchaser and paid over a period of time, then the

Once the requirements of § 1384(a)(1) are satisfied, the sale does not constitute a withdrawal. The seller can then only become liable to the extent provided for in the statute. The statute only provides that the seller will again become subject to withdrawal liability if the purchaser withdraws from the pension plan within five plan years and fails to pay its withdrawal liability. *See* 29 U.S.C. §§ 1384(a)(1)(C); 1384(a)(2). There is no language in § 1384(a)(3) making the seller liable for any payments to the pension plan; it only contains requirements for providing a bond or escrow. "Given the extensive protection already provided pension plans and employees through" the provisions of § 1384, *Cullum* cautions against going beyond the plain language of § 1384 to create new avenues of liability to pension plans. 973 F.2d at 1340. Section 1384(a)(3) should only be read as requiring the provision of a bond or escrow to cover any liability pursuant to sections 1384(a)(1)(C) or 1384(a)(2). Such a reading is consistent with the overall design of the statute which only makes the seller secondarily liable following a sale in accordance with § 1384(a)(1). *See Cullum*, 973 F.2d at 1337 (quoting *I.A.M. National Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 420 (D.C.Cir.1987)) (This section "provides, in effect, a 'safe harbor' protecting an employer from withdrawal liability with respect to a sale of assets that meets certain requirements, all of which are designed to shift obligation for contributions to the purchaser while leaving the seller secondarily liable for a five-year period after the sale.").

■ Bell violated § 1384(a)(3) because it liquidated within the five-year period, but failed to provide a bond or place the appropriate amount in escrow. The Fund would have been entitled to demand that Bell provide the bond or escrow and to pursue such relief if Bell refused. That, however, is not what the Fund demanded; the Fund demanded that Bell pay the withdrawal liability

allegedly due.[9] The Fund was not entitled to demand such payment because Bell did not incur any withdrawal liability when it was liquidated on or before July 31, 1987. Since there is no basis for imposing withdrawal liability, there is no basis for overturning the arbitrator's award. Therefore, Count II must be dismissed. Count I also fails because it is contrary to the arbitrator's enforceable award and would otherwise fail on its merits if considered entirely anew. The Fund's complaint will be dismissed.

Bell also seeks summary judgment on its counterclaim. Since the undisputed facts show that Bell did not owe any withdrawal liability, it is entitled to a refund of the interim payments it has made. The counterclaim is only against the Fund; the trustee is not expressly included as a counterdefendant. It is uncontested that Bell made interim payments of $576,694.53. Bell also seeks prejudgment interest on this amount. Bell, however, provides no calculation of prejudgment interest. Therefore, prejudgment interest will be denied at this time. Judgment will be entered for $576,694.53. Bell must move within the time limits of Fed.R.Civ.P. 59(e) if it wishes to amend the judgment to add prejudgment interest.

IT IS THEREFORE ORDERED that:

(1) Motion by defendant to strike [30–1] is denied.

(2) Motion by plaintiffs for summary judgment on Count II of the amended complaint [19–1] is denied. Cross-motion by defendant for summary judgment of Bell Transit Company [26–1] is granted in part and denied in part.

(3) The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiffs dismissing plaintiffs' cause of action with prejudice. The Clerk of the Court is further directed to enter judgment in favor of counterplaintiff Bell Transit Company and against counterdefendant Central States, Southeast & Southwest Areas Pen-

---

bond or escrow would likely have to remain in effect beyond the five-year period if the time payments went beyond the five-year period. Sections 1384(a)(1)(C) and 1384(a)(2) only refer to withdrawal occurring within the five-year period; they do not say the nonpayment must occur within that period.

9. The Fund does not presently demand any other relief than withdrawal liability and is unlikely to

be entitled to any other relief even if it had sought it. The sale occurred over six years ago so the applicable time period has run without the purchaser withdrawing from the Fund. Therefore, the Fund has not suffered any damages that it can claim and there is no longer any requirement of providing a bond or escrow. The bond that Bell should have provided would have expired already (or any escrow fund would have been returned to Bell).

**1274**

sion Fund on the countercomplaint in the amount of $576,694.53.