CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND, Loran W. Robbins, Marion M. Winstead, et al., Plaintiffs–Appellees,

v.

CULLUM COMPANIES, INC., Defendant–Appellant.

No. 91–2844.

United States Court of Appeals, Seventh Circuit.

Argued May 22, 1992.

Decided Sept. 1, 1992.

Rehearing Denied Oct. 14, 1992.

---

Terence G. Craig, argued, Thomas C. Nyhan, Francis J. Carey, Bruce L. Perlin, Cent. States, Southeast & Southwest Area Pension Fund, Law Dept., Rosemont, Ill., Terrence M. Deneen, Thomas S. Gigot, Groom & Nordberg, Washington, D.C., for Central States, Southeast and Southwest Areas Health and Welfare Fund.

Harry Sangerman, argued, McDermott, Will & Emery, Chicago, Ill., for Cullum Companies, Inc.

Before BAUER, Chief Judge, MANION, Circuit Judge, and GIBSON, Senior Circuit Judge.[*]

MANION, Circuit Judge.

Cullum Companies, Inc. ("Cullum") appeals the district court's enforcement of an arbitrator's decision awarding the Central States, Southeast and Southwest Areas Health and Welfare Fund, a multi-employer pension plan, and its trustees (collectively, "Central States") over $1.5 million in withdrawal liability pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1368, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381–1461. Central States assessed withdrawal liability against Cullum based on its sale of a warehouse to Super Valu Stores, Inc. in 1982. Cullum attempted to structure this sale to comply with the MPPAA's "sale of assets" exemption from withdrawal liability. 29 U.S.C. § 1384. The arbitrator held, however, and the district court agreed, that Cullum was not exempt. Cullum appeals; we reverse.

## I.

Before examining the facts of this case, a brief overview of the relevant statutory

---

[*] Hon. Floyd R. Gibson, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

framework is necessary. The MPPAA "was enacted by Congress to cure the problems arising when an employer ceased making payments to a pension plan fund. When an employer ceased making such payments, the plan would be left with vested pension obligations which were only partially funded." *Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 261 (7th Cir.1989). Under the MPPAA, an employer who withdraws from a multiemployer pension plan is liable for his proportionate share of "unfunded vested benefits." 29 U.S.C. §§ 1381(a) & (b)(1). This withdrawal liability ensures that "the financial burden of his employees' vested pension benefits will not be shifted to the other employers in the plan, and ultimately, to the Pension Benefit Guaranty Corporation, which insures such benefits." *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir.1992). *See also Central States, Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co.*, 788 F.2d 428, 432 (7th Cir.1986) ("Withdrawal liability tends to compensate for the shrinkage of the contribution base that occurs when the number of employees on whose behalf contributions are made decreases.").

An employer can avoid withdrawal liability if he meets the statutory requirements of the "sale of assets" exemption to withdrawal liability codified at 29 U.S.C. § 1384. Under section 1384, an employer's "bona fide, arm's-length sale of assets to an unrelated party," 29 U.S.C. § 1384(a)(1), does not result in withdrawal liability if the sale meets the following requirements: (1) "the purchaser has an obligation to contribute to the plan," 29 U.S.C. § 1384(a)(1)(A); (2) the purchaser provides a five-year bond which is payable to the pension plan "if the purchaser withdraws from the plan, or fails to make a contribution to the plan when due," during the first five years after the sale, 29 U.S.C. § 1384(a)(1)(B); and (3) the contract for sale provides that the seller is secondarily liable for any withdrawal liability during the first five years after the sale, 29 U.S.C. § 1384(a)(1)(C).

The MPPAA's statutory scheme provides for informal resolution of withdrawal liability disputes. The pension plan has initial responsibility for determining whether a withdrawal has occurred and assessing withdrawal liability. 29 U.S.C. §§ 1382, 1391. To collect the withdrawal liability, the plan must send the employer a notice and demand for payment. 29 U.S.C. §§ 1382, 1399(b)(1). An employer who disagrees with a plan's determination of withdrawal liability may ask the plan to review its assessment, 29 U.S.C. § 1399(b)(2), and if still dissatisfied, may initiate arbitration. 29 U.S.C. § 1401(a)(1). Arbitration of any dispute concerning a plan's determination of withdrawal liability is mandatory. If an employer fails to timely initiate arbitration, the amount of withdrawal liability assessed by the plan becomes due and owing, and the plan can sue to collect it. 29 U.S.C. § 1401(b)(1). *See generally, Robbins v. Admiral Merchants Motor Freight, Inc.*, 846 F.2d 1054, 1056 (7th Cir.1988).

## II.

The facts in this case are not in dispute. Cullum owned and operated several "Hinky Dinky" supermarkets and a warehouse which supplied them in Omaha, Nebraska. The Omaha warehouse employed about 100 people, and pursuant to a collective bargaining agreement, Cullum contributed to Central States on their behalf from 1972 to late 1982. Due to rapidly declining sales in the Omaha stores, Cullum sold the warehouse to Super Valu Stores, Inc. in 1982 for $10.3 million.[1]

Cullum attempted to structure this transaction to meet the requirements of the "sale of assets" exemption from withdrawal liability. Accordingly, the purchase agreement obligated Super Valu to continue contributions to Central States for twelve months:

> Not later than ninety (90) days after the First Closing Date, the purchaser shall enter into a written agreement with the Union pursuant to which it will agree

---

1. The purchase price for the warehouse and its fixtures was $4.8 million, and Super Valu paid Cullum $6.5 million for the inventory in the warehouse.

to contribute (and will in fact contribute) to the Multi-employer Plan for a period of twelve (12) months after the First Closing Date for at least sixty-five percent (65%) of the contribution base units for which the Seller had an obligation to contribute to the Multi-employer Plan during the twelve (12) month period prior to the First Closing Date.

*See* 29 U.S.C. § 1384(a)(1)(A). The agreement which Super Valu entered with the union representing the warehouse employees required Super Valu to contribute to the pension plan until February 1986, a three-year commitment. The purchase agreement also obligated Super Valu to post a five-year surety bond payable to Central States "if the Purchaser withdraws from the Multi-employer Plan or if the Purchaser fails to make a contribution to the Multi-employer Plan when it is due at any time during the first five (5) consecutive plan years after the First Closing Date." *See* 29 U.S.C. § 1384(a)(1)(B). Super Valu later posted and delivered to Central States a five-year, $336,000 surety bond. Finally, the purchase agreement provided that, if Super Valu withdrew (or partially withdrew) from Central States during the first five years after the sale, Cullum would remain secondarily liable for any withdrawal liability. *See* 29 U.S.C. § 1384(a)(1)(C). Thus, under the purchase agreement, Super Valu became obligated to make contributions to Central States, and Cullum became secondarily liable, after Super Valu, in case of any nonpayment of withdrawal liability that might be assessed in the first five years following the sale.

At the time of the sale, the Omaha warehouse was losing money. To protect Super Valu from the declining market, therefore, the purchase agreement obligated Cullum to make minimum annual purchases from the warehouse. If Cullum failed to meet the minimum purchase requirements during the first five years after the sale, Super Valu had an option to require Cullum to buy back the warehouse. Following the sale of the Omaha warehouse, Hinky Dinky sales continued to decline. By the end of 1983, Cullum was several million dollars behind in its minimum purchase require-

ments. Thus, in 1984, Super Valu closed the warehouse, fired the employees and then reconveyed the non-functioning warehouse to Cullum. Super Valu stopped making contributions to Central States on behalf of the warehouse employees in September 1984; it had contributed to the pension plan for 22 months. The warehouse was never reopened.

Central States did not assess withdrawal liability against Super Valu or attempt to collect on the $336,000 bond for its failure to make contributions. Instead, in May 1986, Central States determined that Cullum had withdrawn from the pension plan when it sold the Omaha warehouse to Super Valu in 1982 and assessed over $1.5 million in withdrawal liability against Cullum. *See* 29 U.S.C. § 1382. After receiving the required notice and demand for payment from Central States, Cullum asked Central States to review its assessment of withdrawal liability. *See* 29 U.S.C. § 1399(b)(2). Central States affirmed its assessment, and soon thereafter, Cullum timely initiated arbitration. *See* 29 U.S.C. § 1401(a)(1).

Before the arbitrator, Cullum argued that it was exempt from withdrawal liability under the "sale of assets" exemption. The arbitrator found that Cullum's sale of the warehouse to Super Valu was a bona fide, arm's length transaction within the meaning of section 1384(a)(1). And Central States conceded that the transaction met requirements (B) and (C) of section 1384(a)(1): Super Valu posted the required five-year bond, and the contract provided that Cullum would remain secondarily liable for any withdrawal liability for five years. The arbitrator held that Cullum was not exempt from withdrawal liability, however, because the requirement of section 1384(a)(1)(A)—that "the purchaser has an obligation to contribute to the plan"— had not been satisfied. The arbitrator interpreted section 1384(a)(1)(A) to require that the purchaser of the asset actually make contributions to the multiemployer pension plan for a period of time "to be determined by a facts and circumstances test." Merely giving the purchaser a con-

tractual obligation to continue contributions, the arbitrator held, is not enough. He then found that, under the facts and circumstances of this case, Super Valu's 22 months of actual contributions to Central States was not sufficient to satisfy section 1384(a)(1)(A).

Central States filed a complaint in the district court, pursuant to 29 U.S.C. § 1401(b)(2), to enforce the arbitrator's award, and Cullum counterclaimed to vacate the award. The parties filed cross motions for summary judgment. The district court, in a one-page order, granted Central States' motion for summary judgment and enforced the arbitrator's award.

■ On appeal, the parties do not dispute that Cullum's sale of the Omaha warehouse to Super Valu was a bona fide transaction and that the requirements of section 1384(a)(1)(B) and (C) have been met. The sole issue before this court, therefore, is whether the sale meets the requirement in section 1384(a)(1)(A). The arbitrator's factual findings and his resolution of "mixed questions of fact and law" are entitled to deference. 29 U.S.C. § 1401(c); *Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1411 (7th Cir.1989). However, we review the arbitrator's legal determinations, including his interpretation of section 1384(a)(1)(A), *de novo. Id.; see also Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 211 (7th Cir.), *cert. denied*, 493 U.S. 847, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989).

### III.

In his opinion, the arbitrator stated: "The first major obstacle in resolving this issue is the statute itself." Arb.Dec. at 18. Obstacle it may be, but it is the law; and we must ensure that the plain meaning of the statute is applied, not bypassed. Section 1384 is a complex and detailed statutory scheme for allocating responsibility for withdrawal liability between seller and purchaser in a sale of assets. If the requirements of section 1384 are met, an employer's sale of assets is not considered a withdrawal from the pension fund. Instead, the purchaser assumes the obligation to contribute to the fund and becomes primarily liable for any future withdrawal liability; and if the purchaser withdraws from the pension plan during the first five years after the sale, the seller is secondarily liable for any withdrawal liability. This section "provides, in effect, a 'safe harbor' protecting an employer from withdrawal liability with respect to a sale of assets that meets certain requirements, all of which are designed to shift the obligation for contributions to the purchaser while leaving the seller secondarily liable for a five-year period after the sale." *I.A.M. National Pension Fund v. Clinton Engines, Corp.*, 825 F.2d 415, 420 (D.C.Cir. 1987).

Section 1384(a)(1)(A), the first of three conditions for the exemption, requires that:

> the purchaser has an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan.

The plain and unambiguous language of this subsection requires two things: (1) that Super Valu "has an obligation to contribute" to Central States; and (2) "for substantially the same number of contribution base units" for which Cullum was obligated to contribute. The phrase "contribution base unit" is defined as "a unit with respect to which an employer has an obligation to contribute under a multiemployer plan." 29 U.S.C. § 1301(a)(11). For contributors to Central States, a contribution base unit is basically a function of the number of weeks actually worked by covered employees. The purchase agreement provided that Super Valu would make contributions for at least 65% of the contribution base units; Central States does not question that this satisfies the second part of section 1384(a)(1)(A).

Thus, the question before us narrows even further to: What is the meaning of "the purchaser has an obligation to contribute to the plan with respect to operations"? We think it means what it says. To satisfy

the requirement of section 1384(a)(1)(A), Super Valu had to have an "obligation" to contribute to the plan with respect to the sold assets. Since the purchase agreement obligated Super Valu to contribute to Central States on behalf of the employees of the Omaha warehouse for twelve months and the contract Super Valu entered into with the union obligated it to contribute for three years, the requirement of section 1384(a)(1)(A) was satisfied.

■ What occurred after the sale of the Omaha warehouse, whether Super Valu fulfilled its contractual obligations, is simply irrelevant to whether Cullum met the requirement in section 1384(a)(1)(A). The time for determining whether the requirement in section 1384(a)(1)(A) has been met is at the time of the sale, not afterwards. *Jaspan v. Certified Industries, Inc.*, 645 F.Supp. 998, 1005 (E.D.N.Y.1985) ("Although § 1384(a) does not make explicit the time at which the three conditions must be met, its language and structure indicate that the relevant time is when the assets are sold."). More importantly, there is no indication in the language of the statute that anything further—such as fulfillment of the contractual obligation or contributions by the purchaser for five years—is required.

■ This point is particularly telling given that Congress did include such continuing obligations in the other subsections of section 1384. Section 1384(a)(1)(B) requires the purchaser to post a surety bond for five years after the sale in an amount equal to the seller's annual contribution; section 1384(a)(1)(C) requires that the seller contract to remain secondarily liable for withdrawal liability for five years; section 1384(a)(3)(A) requires the seller to post a bond if the seller's assets are distributed or liquidated during the first five years after the sale. Congress could have drafted section 1384(a)(1)(A) to read: "The purchaser must continue contributions to the plan with respect to the operations *for the first five plan years after the sale of assets* and for substantially the same number of contribution base units for which the seller had an obligation to contribute to the

plan." But it did not. No time period is prescribed. Instead, it required the seller to provide secondary assurances. The statute states only that the purchaser must have "an obligation to contribute," and an obligation to contribute is all that is required to satisfy section 1384(a)(1)(A). Since the purchase agreement states that Super Valu would contribute for 12 months and the collective bargaining agreement obligated Super Valu to contribute for 36 months, section 1384(a)(1)(A) was satisfied.

The arbitrator overcame the "obstacle" of the statute's plain language by imposing two (of his own) new requirements onto section 1384(a)(1)(A): (1) actual contributions by the purchaser which (2) continue for an indefinite period of time depending on the facts and circumstances of each case. Predictably, the arbitrator's new requirements were based on legislative history. He noted first that the "MPPAA is unique legislation whose primary purpose 'is to protect retirees and workers who are participants in (multi-employer) plans against the loss of their pensions.'" Arb. Dec. at 19 (quoting H.R.Rep. No. 869 (Part I), 96th Cong., 2nd Sess. 51 (1980) U.S.Code Cong. & Admin.News 1980, pp. 2918, 2919). Based on the "primary purpose" of the MPPAA, the arbitrator concluded:

> Accordingly, it is my opinion that merely creating an obligation upon the purchaser to continue contributions is not enough to accomplish compliance. Such an interpretation could encourage payment of lip service alone to this part of the statute and emasculate the intended purpose of preventing the erosion of the plan's contribution base.

Arb.Dec. at 19–20. After quoting a snippet of legislative history from a Senate committee report to justify his departure from the plain language of the statute, the arbitrator stated:

> Having decided that the mere creation of an obligation to contribute is insufficient to create compliance with [section 1384(a)(1)(A)], it is also my opinion that actual payments in fulfillment of that obligation are indeed a necessary element for compliance and that the period

of time within which contributions must continue after the sale of the assets is to be determined by a facts and circumstances test according to the statute's legislative history.

*Id.* at 20–21. In essence, the arbitrator decided, and the district court agreed, that Congress did not provide enough insurance in the stringent requirements of section 1384. To avoid an interpretation that would encourage paying only "lip service" to the statute, the arbitrator decided that he had to add provisions to the law.

■ The arbitrator's analysis is flawed for three reasons—first, and most fundamentally, because he used legislative history to override the statute's plain language. When Congress enacted the MPPAA, it "did not merely select a broad policy goal and instruct the courts to achieve that objective. Rather, Congress itself decided what rules, and exceptions to those rules, would best achieve its goals." *Bellmont Trucking*, 788 F.2d at 433. Accordingly, the plain language of section 1384(a)(1)(A), which requires only that the purchaser have "an obligation" to continue contributions to the pension plan, "is the most reliable indicator of congressional intent." *Id. See also Allied Products*, 872 F.2d at 213 ("the plain language of the statute is the best evidence of its meaning") (citations omitted); *Teamsters Pension Trust Fund of Philadelphia and Vicinity v. Central Michigan Trucking, Inc.*, 857 F.2d 1107, 1111 (6th Cir.1988) ("In ERISA/MPPAA, Congress provided a comprehensive set of rules governing pension benefits and employer liability; we should apply the statutory language, not create new rules nor apply additional liabilities."). And since the language of section 1384(a)(1)(A) is unambiguous, resort to legislative history is unnecessary. *See Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) ("Where, as here, resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.").

Second, by disregarding the plain language of section 1384 in favor of the general purpose of the MPPAA and selected bits of legislative history, the arbitrator ignored the "realities of the legislative process" and "upset[ ] the delicate balance reflected in a finally worded piece of legislation." *Allied Products*, 872 F.2d at 213. Section 1384 is an exemption from withdrawal liability and therefore represents concerns other than protecting the contribution base of pension plans at all costs. The sale of assets exemption is one of a number of provisions in the MPPAA "designed to limit the impact and application of withdrawal liability." *Textile Workers Pension Fund v. Standard Dye & Finishing*, 725 F.2d 843, 853 (2d Cir.), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984). Using legislative history to further limit the availability of this exemption from withdrawal liability is antithetical to Congress' effort, through section 1384, to ameliorate the imposition of employer withdrawal liability. Thus, the arbitrator has done what this court and the Supreme Court have warned should not be done—used legislative history to change a compromise-born, detailed statutory scheme:

Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Board of Governors of the Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986).

The third flaw in the arbitrator's analysis is his belief that taking section 1384(a)(1)(A) at face value would "emascu-

late the intended purpose of preventing erosion of the plan's contribution base." Section 1384 taken as a whole does not leave multiemployer pension plans or employees unprotected. The pension plans and employees are protected, but the safeguards appear in other subsections of section 1384 and the MPPAA. For example, the section 1384 exemption applies only to a "bona fide, arm's-length sale of assets to an unrelated party." 29 U.S.C. § 1384(a)(1). Similarly, 29 U.S.C. § 1392(c) provides that "[i]f a principal purpose of any transaction is to evade or avoid liability," the withdrawal liability provisions of the MPPAA "shall be applied (and liability shall be determined and collected) without regard to such transaction." These two provisions ensure that businesses cannot avoid withdrawal liability through sham transactions. The parties agree that neither provision applies in this case.

In addition, the statutory scheme enacted by Congress in section 1384 virtually guarantees continued contributions for five years after a sale of assets. Section 1384(a)(1)(B) requires the purchaser to post a bond payable to the pension plan "if the purchaser withdraws from the plan, or fails to make a contribution to the plan when due, at any time during the first 5 plan years beginning after the sale." [2] Section 1384(a)(1)(C) requires that the seller contract to remain secondarily liable for any withdrawal liability incurred in the first five years after the sale, and section 1384(a)(2) provides that the seller "shall pay" withdrawal liability to the pension plan "[i]f the purchaser (A) withdraws before the last day of the fifth plan year beginning after the sale, and (B) fails to

make any withdrawal liability payment when due." [3] Another safeguard appears in section 1384(a)(3)(A): the seller must provide a bond to the pension plan "[i]f all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated" in the first five years after the sale. Given the extensive protection already provided pension plans and employees through these provisions, there is simply no need to abandon the plain meaning of section 1384(a)(1)(A) and engage in statutory revision to ensure the continued solvency of pension plans.

### IV.

Section 1384 carefully delineates the responsibilities of the parties to an asset sale. An asset sale structured to comply with section 1384 does not lead to withdrawal liability on the part of the seller/employer. If the purchaser later withdraws from the pension plan, the plan can assess withdrawal liability against the purchaser. If the purchaser fails to pay the withdrawal liability or fails to make a required contribution, the plan can either collect on the bond posted by the purchaser or seek to collect from the seller based on the seller's secondary liability. This statutory framework fully protects the solvency and viability of pension plans with the least practicable intrusion into normal business transactions. Thus, there is no reason for the courts to add further provisions. The judgment of the district court is REVERSED, and the arbitrator's award is VACATED.

---

**2.** In this case, Super Valu posted such a bond. When Super Valu failed to make contributions after 22 months, Central States could have attempted to collect on the bond. We do not understand why Central States failed to do so. At oral argument, Central States tried to explain its failure to collect from Super Valu on the basis that Super Valu had not, technically, withdrawn from the fund. Apparently, Super Valu still contributes to Central States on behalf of its many other employees. However, the bond is payable if Super Valu withdraws from the pension plan or for failure to make any required contributions. It is undisputed that Super Valu failed to make required contributions; so it is

inexplicable why Central States has not attempted to collect on the bond.

**3.** As required by section 1384(a)(1)(C), Cullum contracted to remain secondarily liable for any withdrawal liability incurred in the first five years after the sale. Pursuant to sections 1384(a)(1)(C) and 1384(a)(2), Central States could have attempted to recover from Cullum on the basis of its secondary liability. Of course, this would require that Central States first try to collect from Super Valu which it did not do.