TRUSTEES OF THE CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND, et al., Plaintiffs–Appellants,

v.

LEASEWAY TRANSPORTATION CORPORATION and Leaseway Trucking, Incorporated, Defendants–Appellees.

No. 95–1999.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1995.

Decided Feb. 8, 1996.

Stephen B. Horwitz, David S. Allen (argued), Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for Plaintiffs–Appellants.

Eugene J. Kelley, Jr., Leslie W. Loftus, David L. Strauss, Thomas M. Leinenweber, Arnstein & Lehr, Chicago, IL, Karen E. Katz (argued), Robert M. Grass, Yoon Hi Greene, Kaye, Scholer, Fierman, Hays & Handler, New York City, Jeffrey D. Wohl, Orrick, Herrington & Sutcliffe, San Francisco, CA, for Defendants–Appellees.

Before WOOD, Jr., FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

The plaintiffs, Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund ("the Fund"), appeal the district court's grant of summary judgment in favor of the defendants, Leaseway Transportation Corp. ("Leaseway") and Leaseway Trucking, Inc. ("Leaseway Trucking"). The Fund filed this action, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), in or-

der to vacate an arbitrator's determination that Leaseway had not incurred partial withdrawal liability within the meaning of 29 U.S.C. § 1385. Leaseway counterclaimed, seeking to recover the amount it had previously paid to satisfy the Fund's withdrawal liability assessment, pending the outcome of the arbitration. The district court upheld the arbitrator's decision and granted summary judgment for Leaseway on its counterclaim. We now affirm the district court's decision.

## I.

Leaseway Trucking, a subsidiary of Leaseway, was under contract to perform delivery services for Carson Pirie Scott & Co. ("Carson") from February 1976 until May 1986. Leaseway Trucking dedicated an entire division ("Leaseway/Carson") to fulfill its contractual obligations. On April 1, 1985, Leaseway/Carson entered into a collective bargaining agreement with the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) ("the CDTU") that required Leaseway/Carson to make contributions to the Fund on behalf of its employees. On April 2, 1986, Carson notified Leaseway Trucking that it intended to cancel their contract, effective May 3, 1986. When Carson terminated the contract on May 3, Leaseway/Carson discontinued its operations entirely, terminated all employees covered by the collective bargaining agreement for such operations, and was no longer obligated to contribute to the Fund. Although Leaseway/Carson ceased contributing to the Fund, other members of Leaseway's controlled group[1] continued to contribute to the Fund under their own collective bargaining agreements with the CDTU. Leaseway Trucking never performed delivery services for Carson again.

Instead, Carson contracted with Black Horse Carriers, Inc. ("Black Horse"), a sub-

sidiary of Niedert Terminals, Inc. ("Niedert"), to replace Leaseway Trucking's delivery operations. On May 4, 1986, one day after Carson terminated its contract with Leaseway Trucking, Carson's contract with Black Horse became effective. Black Horse was not a party to any collective bargaining agreement with the CDTU and was not obligated to contribute to the Fund. Thus, as of May 4, 1986, Leaseway/Carson was not obligated to contribute to the Fund, and no member of the Leaseway controlled group was performing delivery services for Carson.

On July 3, 1986, Leaseway entered into a share purchase agreement with Niedert's shareholders to acquire Niedert and its subsidiaries, including Black Horse.[2] The proposed purchase was approved by the Interstate Commerce Commission on August 28, 1986. On September 30, 1986, nearly five months after Carson terminated its contract with Leaseway Trucking, the agreement closed and Leaseway acquired Niedert and its subsidiaries. Therefore, on September 30, 1986, Black Horse became a member of the Leaseway controlled group. At that time, Black Horse was still providing delivery services to Carson under their contract and had no obligation to contribute to the Fund. Thus, during the Fund's plan year, which ran between April 1, 1986 and March 31, 1987, two dates are important to note: (1) on May 3, 1986, Leaseway ceased to have an obligation to contribute to the Fund under Leaseway/Carson's collective bargaining agreement with the CDTU, and (2) beginning on September 30, 1986, Leaseway (through Black Horse) began performing the identical work for which it previously had been required to contribute.

On November 3, 1986, the Fund assessed partial withdrawal liability against Leaseway based on Leaseway's loss and subsequent reacquisition of the work performed by

---

1. ERISA treats all companies under common control as if they were a single employer. *See* 29 U.S.C. § 1301(b)(1).

2. Leaseway's management first became interested in acquiring Niedert and its subsidiaries in 1984, nearly two years before Carson canceled its contract with Leaseway Trucking. Leaseway's Board of Directors authorized efforts to

acquire Niedert in December of 1985. Black Horse was not the major attraction for Leaseway, which viewed Black Horse as a relatively small, break-even company. The Fund has not alleged that Leaseway acquired Niedert in order to transfer Leaseway Trucking's Carson business to a non-union company.

Leaseway/Carson. The Fund ultimately calculated Leaseway's withdrawal liability as $5,055,002. Leaseway disputed the Fund's assessment, arguing that it had not "continued" to perform delivery services for Carson and thus was not liable for partial withdrawal under 29 U.S.C. § 1385(b)(2)(A)(i). Leaseway initiated arbitration under ERISA's dispute resolution mechanism, and the parties selected a neutral arbitrator. As required by ERISA, Leaseway paid $4,948,589 to the Fund in satisfaction of the Fund's assessment, pending the arbitrator's decision. On February 28, 1992, the arbitrator held that Leaseway had not incurred partial withdrawal liability, due to the five month gap between Leaseway's loss of the Carson account and its acquisition of Black Horse. The district court dismissed the Fund's suit to vacate the arbitrator's decision, granted Leaseway's motion for summary judgment on its counterclaim to recover the liability assessment, and entered a final judgment in favor of Leaseway for $7,260,061.[3]

## II.

The MPPAA imposes liability on employers who withdraw from multiemployer pension plans in an amount equal to their proportionate share of "unfunded vested benefits." 29 U.S.C. §§ 1381, 1391. Without this withdrawal liability, a withdrawing employer could shift the financial burden of its employees' vested pension benefits to the plan's other employers and, indirectly, to the Pension Benefit Guaranty Corporation ("PBGC"), which insures these benefits. *Central States, Southeast and Southwest Areas Pension Fund v. Slotky,* 956 F.2d 1369, 1371 (7th Cir.1992). A partial withdrawal occurs "on the last day of a plan year if for such plan year—(1) there is a 70–percent contribution decline, or (2) there is a partial cessation of the employer's contribution obligation." 29 U.S.C. § 1385(a). Section 1385(b)(2)(A) then provides:

[t]here is a partial cessation of the employer's contribution obligation for the plan year if, during such year—

(i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but *continues to perform work* in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required ... or

(ii) an employer permanently ceases to have an obligation to contribute under the plan with respect to work performed at one or more but fewer than all of its facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceased.

29 U.S.C. § 1385(b)(2)(A) (emphasis added).

■ On appeal, the parties do not dispute the facts but rather present us with a pure issue of statutory construction. Leaseway argues, as both the arbitrator and the district court held, that "continues" in § 1385(b)(2)(A)(i) means to continue without interruption. Thus, under Leaseway's view, a partial cessation only occurs when an employer performs work contemporaneously with the cessation of its obligation to contribute to the Fund for that work. Leaseway concludes that the five month period when it did not perform delivery services for Carson precludes imposition of partial withdrawal liability. The Fund counters that the "work continuity" language encompasses situations where an employer continues performing the work after an interruption. Under the Fund's interpretation, the date of withdrawal (the last day of the plan year for a partial withdrawal) is the reference point from which to determine whether an employer has "continued to perform work" within the plan year. Because Leaseway "continued" to perform delivery services for Carson by the end of the plan year, the Fund concludes that Leaseway underwent partial withdrawal. We review *de novo* the interpretation of

---

**3.** This figure represents the amount of Leaseway's liability payment to the Fund along with pre-judgment interest.

§ 1385 by the arbitrator and the district court. *Central States, Southeast and Southwest Areas Pension Fund v. Robinson Cartage Co.,* 55 F.3d 1318, 1322 (7th Cir.1995). The dispute regarding the meaning of the "work continuity" language in § 1385 is an issue of first impression.

 We begin our interpretive task by examining the language of the statute. *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). When a statute is unambiguous, "we must enforce the plain meaning of the language enacted by Congress." *Family and Children's Center, Inc. v. School City of Mishawaka,* 13 F.3d 1052, 1060 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994). Absent specific statutory definitions, words in a statute are presumed to have their ordinary or natural meaning. *Smith v. United States,* 508 U.S. 223, 228–30, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993). Without a limiting context, the word "continues" in § 1385(b)(2)(A)(i) appears to be ambiguous. "Continue" commonly means both "to maintain without interruption a condition, course or action" *and* "to resume an activity after interruption." Webster's New Collegiate Dictionary (9th ed. 1990). Thus, contrary to Leaseway's assertion, construing "continues" according to its "ordinary meaning" does not end our inquiry.[4] Indeed, statutory interpretation "is a holistic endeavor and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *United States Nat'l Bank of Or. v. Independent Ins. Agents,* 508

U.S. 439, 454–56, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993) (internal quotations and citations omitted). It is a fundamental principle of statutory construction that "the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States,* 508 U.S. 129, 132, 113 S.Ct. 1993, 1996, 124 L.Ed.2d 44 (1993). Often, "the meaning of a word that appears ambiguous if viewed in isolation [will] become clear when the word is analyzed in light of the terms that surround it." *Smith,* 508 U.S. at 228–30, 113 S.Ct. at 2054.

 We find that, in the context of § 1385, "continues" unambiguously means continues without interruption and therefore does not embrace Leaseway's loss and subsequent reacquisition of the Carson account. Carefully examining the structure of the partial withdrawal liability provision, we observe that subsections (a) and (b)(2)(A) refer generally to the plan year as the relevant time period.[5] Sub-subsections (b)(2)(A)(i) and (b)(2)(A)(ii), in contrast, speak to specific momentary events in the plan year that trigger withdrawal liability.[6] Congress placed the "continues to perform" language in the sub-subsections concerning instantaneous triggering *events* rather than in the subsections embodying a time frame. Although the triggering events must certainly occur during the plan year for a withdrawal to ensue, the sub-subsections themselves focus on these momentary events. This is strong evidence that § 1385(b)(2)(A)(i) does not envision the use of the plan year's time frame in determining whether work is "continued."[7]

---

4. Leaseway attaches much significance to the fact that its definition of "continue" (to maintain without interruption) is listed first in the dictionary, while the Fund's definition (to resume after interruption) is listed fourth. However, the relative order of the common dictionary definitions of a single term does little to clarify that term's meaning within a particular context. When a word has multiple definitions, usage determines its meaning.

5. A partial withdrawal occurs "on the last day of a plan year if for such plan year...." 29 U.S.C. § 1385(a). A partial cessation of the employer's contribution obligation occurs "for the plan year if, during such year...." 29 U.S.C. § 1385(b)(2)(A).

6. The triggering event of § 1385(b)(2)(A)(i) is that "the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan...." The parallel event in § 1385(b)(2)(A)(ii) occurs when "an employer permanently ceases to have an obligation to contribute under the plan with respect to work performed at one or more but fewer than all of its facilities...."

7. Congress could have easily placed the work continuity language within the subsections referring to the plan year's time frame. For example, § 1385(b)(2)(A) could have provided that

Moreover, the "continues to perform" language is directly linked to the triggering events in sub-subsections (b)(2)(A)(i) and (b)(2)(A)(ii) through the use of the conjunction "but." We can simplify the language in both of these sub-subsections as "the employer permanently *ceases* to have an obligation to contribute ... *but continues* to perform work." The link between these two clauses leads us to conclude that the question of whether the work "continues" should be determined at the time that the triggering event in the first clause occurs. Thus, the word "continues," when viewed in the context of the overall structure of § 1385 and the prior clause's reference to the immediate cessation of an activity, clearly means to continue without a cessation.

The Fund correctly states that the last day of the plan year is the date of partial withdrawal. 29 U.S.C. § 1385(a); *see also Marvin Hayes Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund*, 814 F.2d 297, 300 (6th Cir.1987). From this simple premise, however, the Fund attempts to draw a multitude of unwarranted conclusions. Under the Fund's theory, the date of withdrawal is always the relevant time from which to determine whether an employer "continues to perform work." For support, the Fund points to the complete withdrawal provision applicable to the building and construction industry, which provides for withdrawal liability if an employer ceases to have an obligation to contribute, and either (1) "continues to perform work ... for which contributions were previously required ..." or (2) "resumes such work within 5 years after the date on which the obligation to contribute ceases...." 29 U.S.C. § 1383(b). The date of complete withdrawal is the date of the cessation of the obligation to contribute to the pension fund. 29 U.S.C. § 1383(e). By piecing together §§ 1383(b) and (e), the Fund reasons that an employer who performs the same work as of the date of withdrawal "continues" the work,

while an employer who performs the same work after an interruption on the date of withdrawal "resumes" the work. The Fund asks us to follow the normal presumption that "identical words used in different parts of the same act are intended to have the same meaning," *Gustafson v. Alloyd Co.*, —— U.S. ——, ——, 115 S.Ct. 1061, 1067, 131 L.Ed.2d 1 (1995), and to carry this definition of "continues" over to the partial withdrawal provision, 29 U.S.C. § 1385. We do not agree, however, with the Fund's strained reading of § 1383(b).

The only natural distinction between the use of "continues" and "resumes" in § 1383(b) is that "continues" means to continue without interruption and "resumes" means to begin again after an interruption. In effect, the Fund would have us believe that "continues" means resumes before the date of withdrawal, while "resumes" means resumes after the date of withdrawal. However, § 1383(b) provides that the date of the cessation of the obligation to contribute is the relevant date for the determination of withdrawal liability. 29 U.S.C. § 1383(b)(2). We recognize that, for a complete withdrawal, the date of the cessation of the obligation to contribute (i.e., the "triggering event") coincides with the date of withdrawal. Yet the mere fact that the date of the cessation also happens to be the date of complete withdrawal provides little support for the Fund's assertion that we should focus on the date of withdrawal to determine the meaning of "continues" and "resumes." Rather, we conclude that, as used in § 1383(b), the term "continues" refers to a continuation of work through the date of the cessation of the obligation to contribute, while "resumes" refers to a resumption of work after the date of the cessation of the obligation to contribute. The Fund has not revealed to us any uses of "continues" or "resumes" within ERISA that are inconsistent with this reading of the two terms, and we see no reason to adopt the

there is a partial cessation of the employer's contribution obligation for the plan year if, during such year *the employer continues to perform work ... and*
(i) the employer ... or

(ii) the employer....
This alternative placement of the work continuity language would have supported the Fund's construction of "continues."

Fund's strange construction of them.[8] Thus, the distinction between "continues" and "resumes" in § 1383(b) turns on whether an activity has been *interrupted* (as of the date of cessation) rather than whether the resumption of an activity precedes or follows the date of withdrawal.

This natural reading of § 1383(b) only supports our interpretation of § 1385. As in § 1383(b), whether work "continues" under § 1385 is determined on the date the obligation to contribute ceases. However, in contrast to a complete withdrawal, for a partial withdrawal there may be a temporal gap between the cessation of the obligation to contribute (the triggering event) and the date of withdrawal (the last day of the plan year). The use of both "continues" and "resumes" in § 1383(b) demonstrates that Congress knew the difference between "continues" (to continue without interruption) and "resumes" (to begin after an interruption) when it enacted MPPAA. By using "continues" (and not "resumes") in § 1385, Congress imposed withdrawal liability on employers who continue performing work contemporaneously with the date they cease their obligations to contribute for that work.

▆▆▆▆ The Fund also argues that our interpretation of § 1385 is inconsistent with what it sees as the purpose of ERISA's withdrawal liability provisions—to insulate a plan from a reduction in its contribution base. *See* H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 1, at 68 (1980), U.S.Code Cong. & Admin.News pp. 2918, 2936–2937; *Central States, Southeast and Southwest Areas Pension Fund v. Robinson Cartage Co.*, 55 F.3d 1318, 1323 (7th Cir.1995) (examining related legislative history to construe ambiguous partial withdrawal liability provision). The Supreme Court has cautioned, however, that "[a]pplication of 'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action." *Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986). Thus we will not override the plain language of § 1385 "in favor of the general purpose of the MPPAA and selected bits of legislative history." *Central States, Southeast and Southwest Areas Health and Welfare Fund v. Cullum Cos.*, 973 F.2d 1333, 1339 (7th Cir.1992). When Congress enacted the MPPAA, it did not merely select a broad policy goal for the courts to achieve but rather provided a comprehensive statutory scheme for the courts to enforce. *Id.; Central States, Southeast and Southwest Areas Pension Fund v. Bellmont Trucking, Inc.*, 788 F.2d 428, 433 (7th Cir.1986). Although we doubt the accuracy of the Fund's assertion that our interpretation of § 1385 is inconsistent with any purpose of ERISA,[9] the Fund's broad policy

8. The Fund cites several provisions which allegedly confirm their reading of the term "resumes" in § 1383(b). However, the use of "resumes" in each of these provisions is completely consistent with the ordinary meaning of "resumes." For example, complete withdrawal liability may be abated or reduced for "an employer who has withdrawn from a plan [and] subsequently resumes covered operations under the plan or renews an obligation to contribute under the plan." 29 U.S.C. § 1387(a), (b); *see also* 29 C.F.R. § 2646.3(c)(2) (PBGC regulations providing that employer can abate liability if it "resumes the obligation to contribute"). Although it is obviously true that an employer cannot abate its withdrawal liability before its date of withdrawal, it is also true that an employer cannot "resume" activities covered by the plan until after it has ceased such activities. The Fund's definition of "resume" is also inconsistent with other uses of "resumes" within ERISA. *See, e.g.,* 29 U.S.C. § 1054(e) (using "resumes" without reference to a date of withdrawal). The Fund offers no plausible reason why we should substitute the Fund's unusual distinction between "continues" and "resumes" for the natural meaning of these terms.

9. In fact, the Fund's construction of § 1385 would often make the exposure to partial withdrawal liability completely dependent on an employer's activities on the last day of the plan year. For example, an employer that lost business on the day the plan year started and regained the business on the day the plan year ended would be liable for a partial withdrawal. In contrast, an employer that lost business on the day before the plan year ended and regained the business on the day after the plan year ended would not be liable for a partial withdrawal. The Fund has not provided any specific policy justification for these seemingly arbitrary results.

arguments need not concern us. Congress has not imposed partial withdrawal liability on employers in every circumstance where a plan suffers a reduction to its contribution base; instead, Congress enacted the specific requirements of § 1385.[10]

In conclusion, we find that "continues to perform work" in § 1385 is unambiguous and does not contemplate an interruption in work. We therefore hold that Leaseway did not incur partial withdrawal liability within the meaning of § 1385 and AFFIRM the judgment of the district court.

10. We note that another protection of a pension plan's contribution base is provided by 29 U.S.C. § 1392(c), which negates the effect of transactions that are intended to evade or avoid liability. The Fund has not claimed, however, that Leaseway's reacquisition of the Carson account was an attempt to avoid its obligations to the Fund.