10-3889-cv
HOP Energy, L.L.C. v. Local 553 Pension Fund

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: October 21, 2011      Decided: May 3, 2012)

Docket No. 10-3889-cv

HOP ENERGY, L.L.C.,

*Plaintiff-Appellant*,

-v.-

LOCAL 553 PENSION FUND,

*Defendant-Appellee*.

Before:

      JACOBS, *Chief Judge*, WESLEY, *Circuit Judge*,
         and SULLIVAN, *District Judge*.[*]

Appeal from a judgment of the United States District Court for the Southern District of New York (Koeltl, *J.*), which confirmed an arbitration award in favor of Local 553 Pension Fund. The district court held that HOP Energy was not exempt from withdrawal liability under the Multi-Employer Pension Plan Amendments Act ("MPPAA") because the purchaser of HOP's New York City operating division lacked an obligation to contribute "substantially the same number of contribution base units" to the pension fund post-sale as

---

[1] The Honorable Richard J. Sullivan, of the United States District Court for the Southern District of New York, sitting by designation.

HOP had contributed pre-sale. We agree. Here, the "contribution base units" were hours of employee pay. Although the purchaser of HOP's New York City operating division had an obligation to contribute to the pension fund at the same contribution base unit *rate*, it had no obligation to contribute substantially the same number of hours of employee pay. Therefore, HOP is not exempt from withdrawal liability.

Chief Judge Jacobs dissents by separate opinion.

**AFFIRMED.**

_____

LINDA L. MORKAN (Frank F. Coulom, Jr., *on the brief*), Robinson & Cole LLP, Hartford, CT, *for Plaintiff-Appellant*.

EUGENE S. FRIEDMAN (William K. Wolf, Anusha Rasalingam, Cristina E. Gallo, *on the brief*), Friedman & Wolf, New York, NY, *for Defendant-Appellee*.

ERIC FIELD, Assistant Chief Counsel (Israel Goldowitz, Chief Counsel, Karen L. Morris, Deputy Chief Counsel, Beth A. Bangert & Richard Luna, Attorneys, *on the brief*), Pension Benefit Guaranty Corporation, Washington, D.C., *for Amicus Curiae Pension Benefit Guaranty Corporation*.

_____

WESLEY, *Circuit Judge*:

**I.**

Plaintiff-Appellant HOP Energy, L.L.C. ("HOP") delivers

fuel oil and provides heating services to homes and

businesses in Massachusetts, Connecticut, Rhode Island, New

Jersey, Pennsylvania, and Delaware through independent

operating divisions. Prior to May 12, 2007, it serviced New

2

York City customers through its Madison Oil ("Madison") operating division. Madison was a "union shop" and had signed the Teamsters Local 553 2004-07 Master Collective Bargaining Agreement (the "2004-07 Master CBA"). On May 12, 2007, HOP sold 100% of Madison's operating assets to Approved Oil Company ("Approved"), also a signatory to the 2004-07 Master CBA.

Teamsters Local 553 has a multi-employer pension fund under the Employee Retirement Income Security Act ("ERISA"). The 2004-07 Master CBA based signatory contributions on the number of hours respective employees worked.

To effectuate Madison's sale, HOP and Approved entered into an Asset Purchase Agreement ("APA"). The APA provided:

> [Approved] shall make contributions to the Local 553 Pension Fund (the "Teamsters Fund") for substantially the same number of contribution base units for which [HOP] had an obligation to contribute with respect to the operations covered by the Teamsters Fund. Notwithstanding the previous sentence and except as otherwise provided in Section 12.1, *nothing in this Section shall impair or limit the Purchaser's right to discharge, lay off, or hire employees or otherwise to manage the operations of the Business, including the right to amend, revise or terminate any collective bargaining agreement currently in effect and, as a consequence, reduce to any extent the number of contribution base units with respect to which* [Approved] *has an obligation to contribute to any plan.*

(emphasis added).

3

Following the sale, HOP ceased operations in New York City and also ceased contributing to the Local 553 Pension Fund. The fund's sponsor assessed HOP withdrawal liability for $1,204,007. HOP asked the fund to reconsider the assessment, claiming that the sale was exempt from withdrawal liability because the Madison sale satisfied 29 U.S.C. § 1384(a)(1) as a bona fide asset sale. The fund upheld its assessment, and HOP commenced an arbitration to challenge its liability.

Prior to the arbitration, HOP and Local 553 stipulated that the asset sale satisfied §§ 1384(a)(1)(B) (bond requirement) and 1384(a)(1)(C) (requirement that the seller remain secondarily liable for five years after the sale). Therefore, the only issue for the arbitrator was whether Approved had a post-sale obligation to contribute "substantially the same number of contribution base units" as HOP. 29 U.S.C. § 1384(a)(1)(A). The arbitrator concluded that the sale did not satisfy § 1384(a)(1)(A) because the APA specifically disclaimed the purported contribution obligation. The district court agreed; HOP timely appealed.

4

## II.

We have yet to decide the standard of review for an arbitrator's finding that a party does not qualify for an exemption from withdrawal liability under 29 U.S.C. § 1384(a)(1). Local 553 and amicus curiae Pension Benefit Guaranty Corporation[1] ("PBGC") argue for "clear error" review, while HOP argues for *de novo* review. The question presented is inherently a question of law as it requires review of contract language juxtaposed to a statutory obligation. Other courts of appeals have found the proper standard of review to be *de novo*; we agree. *See Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 804-05 (2d Cir. 1994) (cataloging other cases and presuming, but not deciding, that the standard of review was *de novo*).

## III.

To qualify for the sale of assets exemption from withdrawal liability, a purchaser must have substantially the same post-sale "obligation to contribute" to the pension

---

[1] PBGC is the federal government agency responsible for administering and enforcing Title IV of ERISA, including the provisions added by the Multi-Employer Pension Plan Amendments Act ("MPPAA"). It often appears as amicus curiae in cases involving MPPAA issues and its views on such issues are entitled to deference. *Beck v. PACE Int'l Union*, 551 U.S. 96, 104 (2007). On December 15, 2011, PBGC responded to our invitation to the United States government to provide its views on certain issues.

5

fund as the seller had pre-sale.  29 U.S.C. § 1384(a)(1)(A). The MPPAA defines an "obligation to contribute" as one arising "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law."  29 U.S.C. § 1392(a).  It defines a "contribution base unit" as "a unit with respect to which an employer has an obligation to contribute under a multiemployer plan."  29 U.S.C. § 1301(a)(11).

Before HOP sold Madison to Approved, it had a year-to-year ongoing ERISA obligation to maintain a threshold level of contribution base units.  If HOP reduced its contribution base units by 70%, or partially ceased its contributions in a given year, it would have been subject to partial withdrawal liability.  29 U.S.C. § 1385.  If it permanently went out of business or terminated Madison's operations, it would have been subject to complete withdrawal liability. 29 U.S.C. § 1383.  The MPPAA seeks to keep this pre-sale contribution obligation constant to maintain the financial stability of the fund; a sale of assets is only exempt from withdrawal liability if the purchaser assumes substantially

6

the same "obligation to contribute" as the seller had pre-sale.[2]

Here, the "contribution base unit" was hours of employee pay. The 2004-07 Master CBA obligated HOP to contribute to the pension fund based on the hours of pay its Madison employees worked. *See* 29 U.S.C. §§ 1301(a)(11), 1392(a). Thus, before the sale, HOP had a year-to-year ongoing ERISA obligation to maintain a threshold level of hours of employee pay. Therefore, for HOP to qualify for the sale of assets exemption, Approved had to assume substantially the same obligation: Approved had to have an obligation to contribute substantially the same hours of employee pay as HOP had contributed pre-sale.

HOP argues that Approved had the requisite contribution obligation because Approved simply "stepped into HOP's shoes." According to HOP, where HOP previously had contributed for a Madison employee's "hour of pay," Approved would now have an identical contribution obligation. The problem with HOP's argument, however, is that it conflates

---

[2] The purpose of withdrawal liability "is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers." *Park S. Hotel Corp. v. N.Y. Hotel Trades Council*, 851 F.2d 578, 580 (2d Cir. 1988).

two distinct terms: (1) contribution base *units* and (2) contribution base unit *rates*. HOP's argument is that Approved had an obligation to contribute to the fund *at the same rate*. We agree that Approved had this obligation. But Approved had no obligation to maintain substantially the same number of "hours of pay." Therefore, the sale did not qualify HOP for an exemption from withdrawal liability.

Other sections of the statute support our view that "contribution base unit" and "contribution base unit rate" are distinct. For instance, when a plan assesses withdrawal liability, it must calculate the annual withdrawal liability payment, which, in pertinent part, is the product of "the average annual *number of contribution base units*" and the "highest contribution *rate* at which the employer had an obligation to contribute." 29 U.S.C. § 1399(c)(1)(C)(i) (emphases added). In another section, and as mentioned earlier, the MPPAA explains that an employer partially withdraws from a plan and is subject to partial withdrawal liability when its contributions decline by at least 70% measured by comparing the *number* of contribution base units from year-to-year. 29 U.S.C. § 1385(b). Under each of these sections, one looks at the

8

"number of hours of pay" as the "contribution base unit."

"[W]e read statutes as a whole, with no section interpreted in isolation from the context of the whole Act." *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) (internal quotation marks omitted).

It is clear from the sale agreement that Approved had no "obligation to contribute" substantially the same number of hours of pay as HOP had contributed pre-sale. For one, the APA specifically disclaimed any such obligation. In addition, HOP offers no language in the 2004-07 Master CBA, any other collective bargaining agreement, or any applicable labor management relations law that obligated Approved to contribute substantially the same number of hours of pay as HOP had contributed pre-sale.[3] *See* 29 U.S.C. § 1392(a). As the arbitrator explained:

> Nothing in the union-employer agreements in the record [those between Local 553 and Approved] require[d] Approved, in respect to the operations of HOP, which for all practical purposes was the same as Approved's, to keep a certain number of employees, whether from Approved's ranks or HOP's, on the payroll to achieve a contribution base unit

---

[3] For instance, as part of the sale, Approved could have entered a stand alone collective bargaining agreement with Local 553 obligating it to ensure substantially the same number of hours of pay as HOP had provided pre-sale. *See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Cullum Co., Inc.*, 973 F.2d 1333, 1338 (7th Cir. 1992).

9

level that would remain substantially the same as HOP's pre-sale.

We agree with the district court that Approved lacked an "obligation to contribute . . . substantially the same number of contribution base units" to the pension fund as HOP had contributed pre-sale.

Finally, it makes no difference that Approved might *actually* have contributed to the plan based on substantially the same number of hours of pay as HOP had contributed pre-sale. Section 1384(a)(1)(A) focuses on the purchaser's *obligation* at the time the sale closes and not what happens after the fact. *Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 973 F.2d at 1338.

**IV.**

HOP next argues that the arbitrator erred by excluding extrinsic evidence about its intent when entering the APA. New York law governs the APA. Under New York law, a court must give full effect to unambiguous contract terms. *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). Extrinsic evidence cannot be used to vary the terms of a facially unambiguous contract. *See Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 572 (1986). With unambiguous contracts, a party's subjective intent and

10

understanding of the terms is irrelevant.  Additionally, under the MPPAA, it is the arbitrator who determines whether a contract is ambiguous.  *Joseph Schlitz Brewing Co. v. Milwaukee Brewery Worker's Pension Plan*, 3 F.3d 994, 999 (7th Cir. 1993).  Here, the arbitrator found the contract unambiguous.  This was not error.

## V.

The dissent presses for reversal because, it asserts, the majority opinion views the purchaser's obligation to contribute as ongoing and, apparently, perpetual. Dissenting Op. at 3-4.  But, as the dissent recognizes, the duration of the buyer's obligation to contribute was neither raised by the parties nor decided by this majority opinion.  The sole issue presented for review was whether, at the time of sale, Approved had substantially the same obligation to contribute as HOP.  We think it clear Approved did not.

Our dissenting brother fears that our decision can be read to imply an "obligation to maintain historical contribution levels into the future."  Dissenting Op. at 8. We see no reason to decide an issue out of fear that some will misunderstand our efforts here when the parties never raised the issue.

11

Simply put, 29 U.S.C. § 1384(a)(1)(A) does not address the duration of the purchaser's obligation to contribute. It asks only whether the purchaser had the same obligation to contribute as the seller at the time of sale. If the plain language of the statute impairs the ability of an employer to sell its business (we are not sure it does), as our dissenting brother fears, the problem lies with the statute and not this Court.

Judges are not statutory fix-it-folk. No one, including our dissenting brother, has argued that the statute imposes an absurd result. *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring). While we do not dispute that the dissent raises an issue of concern, we do not feel called upon to address it.[4]

### CONCLUSION

HOP has not demonstrated that Approved was obligated to contribute substantially the same number of "contribution base units" (hours of pay) as HOP had contributed pre-sale. The arbitrator did not err by

---

[4] It does strike us as odd that, notwithstanding the dissent's plausible concern that the statute affects the alienability of businesses that are subject to the type of retirement plans at issue here, there is a dearth of cases dealing with this issue.

excluding extrinsic evidence of the parties' intent when entering the transaction because the APA was unambiguous. We therefore **AFFIRM** the district court's judgment.

**AFFIRMED.**

DENNIS JACOBS, Chief Judge, dissenting:

I agree with much of the majority opinion; but because I part company on one decisive point, and urge an analysis that was not expressly argued on appeal, I respectfully dissent.

Under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), an employer that withdraws from a plan--either by ending contributions or by dipping below 30% of its contribution level--is liable for its proportionate share of the unfunded vested benefits, with exceptions. See 29 U.S.C. §§ 1381, 1383, 1385. If a company ceases making contributions because it has sold its assets, the MPPAA provides an exemption from withdrawal liability upon three conditions, including that the purchaser undertakes "an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan." Id. § 1384(a)(1)(A). Here, the buyer undertook just such an obligation when it stepped into the seller's shoes pursuant to the Asset Purchase Agreement (the "Purchase Agreement"). Because the buyer's post-sale obligations were identical to the seller's obligations pre-sale, the transaction complied with the sale-of-assets exemption.

Under the sale-of-assets exemption from withdrawal liability, a seller is deemed to have withdrawn from a multi-employer pension plan following a bona fide arm's-length asset sale unless three conditions are satisfied.  It is stipulated that two of these conditions have been satisfied here, in the sale of Madison Oil by HOP Energy, LLC, to Approved Oil Company.  First, Approved has posted a bond (for the greater of the three-year average of HOP's contributions or its contribution in the year before the sale), payable if Approved withdraws from the plan or defaults within five years of the sale.  Id. § 1384(a)(1)(B).  Second, the Purchase Agreement provides that, if Approved withdraws from the plan within five years after the sale, HOP as seller is secondarily liable for any withdrawal liability.  Id. § 1384(a)(1)(C).

Given compliance with these two conditions, payment of withdrawal liability is secured even if the successor employer withdraws.  In this way, the purpose of the statute--the assured funding of multi-employer plans--is achieved.  See Park S. Hotel Corp. v. N.Y. Hotel Trades Council, 851 F.2d 578, 580 (2d Cir. 1988); see also 29 U.S.C. § 1369(a) (imposing liability where "a principal

2

purpose of any person in entering into any transaction is to evade liability to which such person would be subject" under the MPPAA). Even so, however, compliance with those two conditions secures withdrawal liability only if the buyer uses the assets to continue the business: The triggering event--the buyer's withdrawal--can occur only if the buyer first assumes the obligation to contribute.

The buyer's obligation to contribute is assured by the third condition, the one at issue on this appeal: that "the purchaser [have] an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan." Id. § 1384(a)(1)(A). An "obligation to contribute" may arise, as here, under a collective bargaining agreement ("CBA"). Id. § 1392(a)(1).

**II**

As the majority opinion reads the third condition, the buyer's ongoing obligation is to contribute in the future at substantially the same level as the seller's contributions as of the transaction date. One remarkable feature of that reading is that it has no end-point. The majority opinion

3

does not reach that issue, and the parties do not argue it. But it seems to me decisive that the obligation recognized in the majority opinion runs to an unspecified future, or in perpetuity. That would be an unaccountable omission in a statute that elsewhere (as set out above) fixes exact time parameters for the obligations it creates: the period of the bond (five years), the contribution periods for calculating the bond amount (three years or one, depending), the period of the seller's indemnity for the buyer's obligation (five years).

I do not believe that the third condition requires the buyer to commit to maintain a historical level of contributions for an unknown time in the future. In my view, the purchaser's obligation is a test, applied at the time of the sale transaction, and does not outlive the transition from one employer to the other. See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Cullum, 973 F.2d 1333, 1338 (7th Cir. 1992) ("The time for determining whether the requirement in section 1384(a)(1)(A) has been met is at the time of the sale, not afterwards."); Jaspan v. Certified Indus., Inc., 645 F. Supp. 998, 1005 (E.D.N.Y. 1985) (same).

4

The evident purpose of the condition is to establish continuity between the obligations of the seller immediately prior to the sale and the obligations of the buyer immediately thereafter. It requires the buyer to take the assets subject to the collective bargaining agreement of the seller (or enter into one of its own), and thus prevents the buyer from severing the physical assets of the business from the human capital that worked them. So if the buyer intends to resell the assets or move the business elsewhere, and thereby avoid assuming the seller's obligations under the plan, then the seller will be assessed withdrawal liability; the seller can avoid liability only if the buyer inherits the seller's contribution obligations going forward. An analogous provision is § 1398(1), which states that no withdrawal liability is incurred following certain changes in ownership structure, such as mergers and consolidations, so long as "the change causes no interruption in employer contributions or obligations to contribute under the plan." 29 U.S.C. § 1398(1).

Once the third condition is satisfied, that is, once the seller's contribution obligation passes to the buyer, the plan suffers no harm on account of the transaction

5

alone. The purchaser may later increase or reduce the aggregate number of hours worked by its employees (with such consequences as the CBA and the statute may provide); but these are operational decisions that the seller was free to make if there had been no sale. What comes after, once the buyer is in the shoes of the seller, is that the buyer may go wherever the seller could have gone.

**III**

The transaction at issue complied with the sale-of-assets exemption from withdrawal liability. Under the CBA to which HOP and Approved were both signatories, employers are required to make contributions to the Local 553 Pension Fund (the "Fund") for "all hours of which pay is drawn by an employer for each of his employees covered by the collective bargaining agreement" at a specified hourly rate which increases annually (subject to a 1700 hour cap per employee per year). As the majority opinion demonstrates, the relevant "contribution base unit" is therefore each hour worked by covered employees. See id. § 1301(a)(11). The Purchase Agreement duly provides (adapting the wording of the statute) that Approved "shall make contributions to the

6

Local 553 Pension Fund . . . for substantially the same number of contribution base units for which [HOP] had an obligation to contribute with respect to the operations covered by the Teamster's Fund."  By virtue of this wording, as well as Approved's express assumption of HOP's CBA and Approved's own CBA with Teamster's Local 553, Approved undertook substantially the same contribution obligation that HOP had prior to the sale: to contribute a particular amount for each hour worked by its covered employees.  Pre-sale, HOP had no obligation to maintain any particular absolute contribution level from month to month or year to year; the statute demands no more from Approved.

The buyer's necessary obligation is in no way undermined by the proviso in the Purchase Agreement that it does not "limit [Approved's] right to discharge, lay off or hire employees or otherwise to manage the operations of the Business, including the right to amend, revise or terminate any collective bargaining agreement currently in effect and, as a consequence, reduce to any extent the number of contribution base units with respect to which [Approved] has an obligation to contribute to any plan."  This proviso is an admirable summary of the right that HOP enjoyed prior to

7

the transaction, and that Approved enjoys under substantive labor law and the CBA.  Every other contributor to the Fund enjoys that same right.

**IV**

The majority opinion matters because it can be read to say (though it does not hold) that a purchaser of assets must agree not to reduce its plan contributions (i.e., not to reduce the number of hours worked by its employees) forever, come hell or high water.  Of course, this would render many businesses unsalable.  Any obligation to maintain historical contribution levels into the future, perpetual or not, raises radical and expensive uncertainties.  HOP's withdrawal liability, fully one-third of the $3.6 million purchase price, is imposed because the statutory undertaking recited in the Purchase Agreement was qualified by a proviso that affirms the right of Approved to control the business going forward.  The prospect of such a punishing liability may compel sellers to insist on an undertaking by the purchaser that omits the proviso and that therefore might be read to guarantee the seller's historical contribution levels ad infinitum.  But what rational buyer

8

would be willing to acquire a business if it had to make such a commitment, and assume unknown risks for an unknown period?

I would reverse.